R. F. HACKETT and others v. QUINCEY SHUFORD and others.

*Husband and Wife—Sale of Wife's Land, when proceeds belong to Husband—Evidence of Agreement.*

1. Money received by a husband, prior to the adoption of the constitution of 1868, from the sale of his wife's real estate, belongs to him absolutely, unless at the time he received it he agreed to repay it to her, and obtained possession of it upon the faith of such agreement.

2. And proof that the wife requested the husband to invest the proceeds in the purchase of other land, but expressed no wish that the purchase should be made in her name or for her benefit, is no evidence of such agreement.

(*Temple* v. *Williams*, 4 Ired. Eq., 39 ; *Dula* v. *Young*, 70 N. C., 450 ; *Smith* v. *Smith*, Winst. Eq., 30, cited and approved.)

CIVIL ACTION tried at Spring Term, 1881, of WILKES Superior Court, before *Seymour, J.*

This action was brought by the plaintiffs against the defendants for the specific performance of a contract to convey a certain tract of land, which their ancestors had covenanted upon a valuable consideration to convey to them.

The following are the facts proved by the plaintiffs which are uncontradicted :

In April, 1858, Benjamin F. Petty contracted in writing to sell the *locus in quo* to R. F. Hackett and J. W. Hackett for $2,700. J. W. Hackett agreed by parol to assign his interest to R. F. Hackett, and R. F. Hackett assigned to J. F. Graves, as trustee for the wife of R. F. Hackett. The whole of the purchase money was paid to Benjamin F. Petty. The Hacketts entered into possession of the land at the time, bond for title was made to them, and have been in possession ever since, but no deed was ever made by Petty. The $2,700 was a full price for the land, and the plaintiffs had no notice at the time of the purchase of the defendants' alleged equity. Petty died intestate in 1872, and the defendant, Rosseau, took out letters of administration on his es-

tate. The said Petty was married three times. His first wife was Cynthia, the daughter of John Bryan, by whom he had issue, the defendants, Julia, intermarried with the defendant Quincey Shuford; Lucinda, intermarried with L. D. Parks; Laura, intermarried with the defendant Henry Shuford; Joanna, intermarried with defendant J. T. Porter; Adelia, intermarried with the defendant F. S. Doughton; and a son named William, now dead, who left surviving him three children of tender years, whose christian names are not known. The other heirs of the said Petty are defendants and his children by his other wives.

The defence set up by the defendants was that the land in controversy, known as the "Gilreath land" lying on the south side of Yadkin river in the county of Wilkes, was purchased by Benjamin F. Petty with money which was the separate property of his wife, Cynthia, and that under an agreement between Cynthia and himself that it should be invested in land, this land was purchased by him and paid for with the money of Cynthia, but the title was taken to himself.

The defendants, with the view of sustaining the defence, offered in evidence the last will and testament of John Bryan, deceased, the father of Cynthia Petty, and grandfather of the defendant. The said Bryan in his will, among other things, devised and bequeathed as follows, to wit: " I give and bequeath to my beloved wife all my estate, real and personal, that is to say, all my lands, negroes, money on hand, notes, bonds, deeds of trust, farming utensils, household and kitchen furniture, and stock of every kind during her natural life, and she may give any part of it to our children, as she pleases, so that they have equal shares. * * * My will is that my wife Nancy Bryan, whom I appoint to be sole executrix of this my last will and testament, shall have the sole disposal of my estate, both real and personal, so as to make as equal division as possible,

10

and do hereby authorize and empower her to dispose of and convey the same by deed or otherwise, in the manner heretofore directed, and according to what is hereafter stipulated. * * * My desire is that my land on the south side of the Yadkin river, should not be divided, but remain in one tract, as I think that dividing it would hurt its value, and that if any of my children should wish to purchase it to live upon, my other children should give them the preference."

Nancy Bryan, appointed executrix, renounced the right to execute the will, and John Rosseau was appointed administrator with the will annexed.

On the 20th day of October, 1847, all the lands belonging to the said John Bryan, lying on the south side of the Yadkin river, consisting of about twelve hundred and six acres, were sold to Wm. Parks for the sum of about six thousand dollars, and a deed of conveyance for the same was executed to him by Elisha Martin, James M. Parks, Mary Parks, B. F. Petty, Cynthia Petty and Nancy Bryan.

The execution of the deed was proved by one of the subscribing witnesses, and the privy examination of Cynthia Petty was taken before two justices of the peace in the county of Wilkes, by virtue of a commission issued to them for that purpose from the county court of said county.

It was in proof that the proceeds of the sale of this land belonged, under the will of John Bryan, to his four daughters, of whom Cynthia Petty was one. There was evidence going to show that her husband, B. F. Petty, received into his possession her share of the proceeds of this sale, amounting to some sixteen hundred dollars. One Leland Martin testified that John Bryan died in 1842. His land was sold in 1847 for $6,600. The money was considered the property of his four daughters, $1,650, the amount due to each. Mrs. Bryan died in 1847. B. F. Petty was living in 1847 on a tract of land worth $2,000 or $3,000; owned another

tract, and also a good many negroes before the death of John Bryan, but had sold them.

Julia Shuford, one of the defendants, and a witness in behalf of the defendants, testified that she was the daughter of B. F. Petty and his wife Cynthia, and that her father received a large sum of money, the amount not remembered, from the estate of John Bryan. She said she knew that her father purchased the land in controversy with a portion of the same money; and her mother requested her father to invest the money in the land, remarking that it would be of some benefit to her children, and he did so at the request of her mother the said Cynthia. Her father had no means of his own, at the time of the purchase of the land, with which to buy the same. In a second deposition of this witness, she said, she often heard her father and mother talk about it. The talk was to the effect that the money derived from the Bryan estate ought to be invested in land by my father for the benefit of the children. She was somewhere between 15 and 18 years old at that time.

John Rosseau was examined as a witness for the defendants, knew nothing about the money with which the land was purchased by Petty, but stated that Petty did not have the means of his own sufficient to enable him to pay for the land, for about that time he had loaned him money. He had the character of being a close, saving, tight man.

Jordan Petty testified that he had heard of the sale of the Bryan land in the fall, and Petty on one occasion said he had got the money for his part of the land. The May after, he heard a conversation between Petty, his wife and daughters. The old lady said, "You and the children want to run through all my money. I want you to take it and buy land to do me and the children some good."

Peggy Rosseau was also examined by the defendants, and stated that she heard a conversation between Petty, his wife and children a short time after the Bryan land was sold,

about 30 odd years ago. Petty on one occasion came in and said he had the calico. The daughter wanted him to buy a centre table. The old lady said, "you shan't have either, I want my money put in land." He asked her, "what kind? do you want my children to settle in this poor country?" "I want you to go and buy land with it." Not a year after I heard him talking with his wife about buying the Lenoir place—the name of the *locus in quo*. The conversation first mentioned might have been five months after the sale of the Bryan land.

In the statement of the case on appeal His Honor says that the defence made upon the trial was that the *locus in quo* was purchased by B. F. Petty with money which was the separate property of his wife, Cynthia, and that, under an agreement between Cynthia and himself that it should be invested in land, this land was purchased by said Petty and paid for with the money of said Cynthia, but the title was taken to himself.

After the evidence was all introduced, the court intimated that in its opinion this defence was not made out by the evidence; and further, that if the facts alleged were proved, they would not avail against the plaintiffs' equity. Thereupon the defendant's counsel stated that they had nothing to say in opposition to a verdict, *excepting upon this defence.* The jury thereupon rendered a verdict for the plaintiffs, and the defendants appealed.

*Mr. J. M. Clement,* for plaintiffs.
*Messrs. J. M. Furches* and *G. N. Folk,* for defendants.

ASHE, J. This narrows down the case on the appeal to the question whether the land in controversy was bought by B. F. Petty with money which was the separate property of Cynthia, his wife, and if so, whether there was an agreement at the time of his receiving the money between him

and Cynthia that it should be invested in the land in controversy. There was certainly some evidence, sufficient we think, to be left to the jury, that the Gilreath land was purchased by B. F. Petty with money which he had received from the sale of the lands belonging to the Bryan estate, in which his wife had an interest. But it does not follow that the money so received by her husband was her separate property. The land was sold and the deed was executed by Petty and his wife Cynthia, Nancy Bryan and others. The consideration was $6,600, of which Cynthia's share was about $1,600. This amount it is insisted by the defendants was paid to her husband. Admitting that to be so, how did he hold it? As trustee for his wife, or in his own right as husband by virtue of his marital rights?

If the transaction had taken place since 1868, it may be that the money received was held by the husband in trust for his wife, as her separate estate. But this transaction occurred before the constitution of 1868. And under the law, as we understand it to have existed, when money was received by a husband from the sale of his wife's real estate, it belonged to the husband absolutely unless *at the time he received it*, he promised the wife to repay it, and obtained possession of it upon the faith of such promise.

In *Plummer* v. *Jarman*, 44 Md., 637, it was held that, "the money arising from the sale of the wife's inheritance, was not her separate estate, as it would be now under the provisions of the Code; but on the contrary it was subject to the control of the husband by virtue of his marital rights having attached; the money received by him was at his disposal absolutely, and any mere promise that he may have made to his wife was purely voluntary and without consideration." In *Label* v. *Slingluff*, 52 Md., 132, the court held that the money received by the husband from the wife's real estate, before the Code, became the absolute property of the husband, unless at the time he received it, he promised

the wife to repay it, and obtained possession of it upon the faith of such promise.

In this state in the case of *Temple* v. *Williams*, 4 Ired. Eq., 39, which was a bill in equity for the conveyance of a tract of land, the equity set up in the bill was that the complainant was the owner in fee of a tract of land, and her husband proposed that they should sell her land and invest in the purchase of another tract more desirable, and take the deed in her name, but the husband purchased the other tract with the proceeds of the sale of her land and took the deed to himself, and died before conveying any part thereof to her. Chief Justice RUFFIN, who delivered the opinion of the court, said : "It is true that a husband and wife may in equity deal with each other in respect to her inheritance, but it is extremely difficult to do so with any security to her, without the intervention of a third person as trustee, because it is hard to tell in many cases, whether she means to stand upon her separate rights, or to surrender them to him ; and therefore when she and her husband turn her land into money, and she does not place her money in the hands of some third person for her, and as her separate property, but suffers the whole to be paid to him, the clearest proof is requisite to rebut the presumption that it was paid to and accepted by the husband for himself, and not as trustee for his wife."

In *Dula* v. *Young*, 70 N. C., 450, and *Smith* v. *Smith*, Winston's Eq., 30, the court came to different results from that reached in the above cited cases, and gave relief to the wife, whose money arising from the sale of her land, had been used by the husband in the purchase of other lands in his own name. But in each of these cases the equity of the complainants was put upon the ground of an express *agreement* between the husband and wife, that her land might be sold and the money invested in other lands for her benefit. In the former case the *agreement* was that if the wife would

join the husband in the conveyance of a tract of land descended to her from her father, he would convey to her another tract in lieu of the one conveyed. In the latter, the *agreement* was that the wife would consent to the sale of land held in her own right, upon her husband's agreeing that he would convey to her, as a consideration for her land, another tract, or slaves of equal value with her land, or in some other way secure her from loss.

In putting the relief granted in these cases upon the ground of the *agreement* between the husband and wife, these decisions sustain the opinion of Chief Justice RUFFIN in the case of *Temple* v. *Williams*, *supra.*, if the legal opinion of so great a jurist could ever need support.

But our case is distinguished from those cited, in the particular that there was here no evidence of any *agreement* between B. F. Petty and his wife, Cynthia, *at or before the time* he received her money, that he would invest it in other lands. The proof falls short of establishing any such agreement. Taking the testimony of Julia Shuford, which is the strongest evidence offered by the defendants in regard to the use of the money received by Petty from the Bryan estate, and it tended only to prove the fact that the money received by her father was invested in the purchase of the Gilreath land. She speaks of no agreement, but that her mother, Cynthia Petty, requested her father, B. F. Petty, to invest the money in the land, remarking, "that it would be of some benefit to her children."

The witness, Jordan Petty, testified to no agreement, but that he heard a conversation between Petty and his wife and daughters, and the wife said to her husband, "you and the children want to run through all my money. I want you to take it and buy land to do me and the children some good." The testimony of Peggy Rosseau is not more to the point. She stated that sometime after the Bryan land was sold, about thirty years ago, she heard the old lady say, "I

want my money put in land;" her husband asked her, "what kind? Do you want my children to settle in this poor country?" "I want you to go and buy land with it."

This is the substance of the testimony offered upon the point, and in our opinion it does not tend to prove an agreement between Petty and his wife *at or before the time of receiving the money*, that he should invest it in land for her benefit.

She requested that the money should be invested in other land, just as she might have done if the money had belonged to her husband in his own right. She wished land bought that it might be of benefit to her and the children. No wish was expressed that the land should be purchased in her name. The money was invested in the land in the name of the husband. The purchase enured to the benefit of herself and children. It is to be presumed she was satisfied with it as no complaint was made by her. The land was afterwards sold for a price considerably in advance of the amount paid by him for it. He and his children reaped the benefits and they have acquiesced in the transaction for thirty-five years.

We concur with His Honor that there was no evidence to be left to the jury in support of the defence set up by the defendants.

We have not considered other positions taken and urged in this court by the defendants, as it appears from the "statement of the case" the *sole defence* in the court below was rested upon the facts, that the money used by B. F. Petty in the purchase of the land in question was the separate estate of his wife Cynthia, and an *agreement* between them that it should be invested in this land for her benefit.

Nor have we taken into our consideration the respective rights of the plaintiffs *inter sese*, in the land in controversy. That is a matter to be inquired of upon a reference for that purpose.

There is no error in the judgment of the superior court. The case is remanded to that court that further proceedings may be had in conformity to this opinion.

No error.                                    Affirmed.