VOORHEES, MILLER & CO. v. BLANTON et al.

(Circuit Court, W. D. North Carolina. November 2, 1897.)

1. FRAUDULENT CONVEYANCES—DEED TO WIFE—CONSIDERATION.

In a creditors' action in North Carolina to set aside conveyances, it appeared that the debtor had held in his own name a farm for which about half the purchase price had been furnished by his wife's father, for the purpose of buying land for her. He conveyed it all in settlement of a debt, and in consideration of the wife's half interest in it conveyed to her a house and lot about equal to that interest. Some of the payments for the wife had been made prior, and some subsequent, to the adoption of the provision (Const. N. C. art. 10, § 6) relating to the property rights of married women. *Held*, that as to both classes of payments there was a resulting trust for the wife, and that her interest was such as to support the conveyance to her.

2. SAME—INADEQUATE CONSIDERATION.

Mere inadequacy of consideration in honest family settlements is not a badge of fraud.

3. SAME—INSOLVENCY—PREFERENCES.

In the absence of a statute forbidding preferences, a debtor in failing circumstances may prefer one creditor to another.

4. SAME.

Any conveyance whose object or manifest tendency is to hinder, delay, or defeat a creditor falls within the meaning of the statute (Code N. C. § 1545) relating to fraudulent conveyances.

5. SAME.

If a conveyance by a debtor in failing circumstances is void as to one creditor it is void as to all.

6. SAME—PAYMENTS BY GRANTEE—REIMBURSEMENT.

Where a debtor in failing circumstances makes a conveyance in fraud of creditors, and the grantee in consideration thereof pays a particular valid debt of the grantor, the circumstances may be such as warrant his reimbursement from the proceeds, in case of sale of the property in a creditors' suit.

7. SAME—CREDITORS' SUIT.

Where, after a conveyance of a house and lot by a debtor in failing circumstances, voidable for fraud, the house is burned down, and is restored with the money of an innocent third party, she should, in a creditors' suit to set aside the conveyance, be allowed a lien therefor on the premises.

This was a suit in equity by Voorhees, Miller & Co. against William M. Blanton and others to set aside certain conveyances alleged to have been made in fraud of creditors.

Merrimon & Merrimon, for plaintiffs.
P. J. Sinclair and Ed. Justice, for defendants.

BRAWLEY, District Judge.    This is a bill to set aside certain conveyances as fraudulent.    The plaintiffs are merchants in Cincinnati, Ohio, who sold a bill of goods to C. D. Blanton & Co., merchants doing business at Asheville. N. C., and the defendant William M. Blanton, with others, guarantied the payment of the same.    William M. Blanton was a farmer residing in McDowell county on what is hereinafter called "South Muddy Creek Farm," in McDowell county, N. C., until about the year 1878, when he moved to the town of Marion, in the same state, where he engaged in merchandizing, and is now about 65 years of age.    He became a partner with his son

Charles, who was doing business at Asheville under the name of C. D. Blanton & Co. Some time before the transactions hereinafter related he gave his interest in that business to a younger son, Josephus, but there was no publication of his withdrawal from that firm until after the accrual of the indebtedness which is the subject of this controversy. Charles D. Blanton became greatly involved in debt outside of his mercantile obligations, and his father was surety for a considerable amount. In December, 1892, Charles D. Blanton sold the stock of goods of C. D. Blanton & Co. in Asheville to J. D. Brevard for $16,000 under a bill of sale which provided that the proceeds should be applied to the payment of certain debts of C. D. Blanton & Co. While a controversy subsequently arose, and it was disputed whether the debt to the plaintiffs was among those provided for in this bill of sale, I am satisfied from the testimony that William M. Blanton at the time believed that it was so provided for, and that he believed that the amount of $16,000, the purchase price of the stock of goods, was ample to pay all of the debts of C. D. Blanton & Co. for which he was liable as indorser or guarantor. Subsequent events have demonstrated that he was mistaken in this conclusion. The debt of the plaintiffs remains unpaid, the property of William M. Blanton has been disposed of, and this suit is for the purpose of inquiry into such disposition of it, and to set aside all of the conveyances as fraudulent. While it might be that a court would feel itself compelled to set aside conveyances as in fraud of creditors, although there was no intention at the time to defraud a particular creditor, it cannot in fairness determine the character of a series of transactions without inquiry into the motive which impelled them, and entering as far as may be into the state of mind of the chief actor therein.

I find sufficient testimony to support the conclusion that at the time when William M. Blanton commenced to dispose of his property in the manner to be hereinafter specifically considered he was of the opinion, founded upon what to him was sufficient ground for the belief, that the plaintiffs' debt was already provided for; and it may be as well to say, further, that no statute of the state of North Carolina has been cited forbidding preferences among creditors, and these conveyances are not contested on that ground. Here, then, we have an old man who finds himself in his declining years involved as surety for his son's indebtedness, which had already absorbed part of his fortune, and which was sufficient to sweep away all of his property. On the part of the plaintiffs it is contended that, confronted by these conditions, he straightway devised and executed such disposition of it as would secure for himself such ease and comfort as could be provided, and it must be admitted that the temptation so to do was sore, and such as human experience teaches us is often sufficient to swerve good men from the straight and narrow way. On the part of the defendant, it is contended that having led a life of industry and integrity, which had secured for him the respect and confidence of his fellows, his first and controlling thought was so to dispose of the remnant of his property as to pay all of his debts upon the best terms that he could secure, and thus become a free man again, maintaining his own self-respect and that of his

fellowmen. The great searcher of hearts alone can know with absolute certainty which theory is right,—that of the plaintiffs or that of the defendant. Without that guidance, and with such lights as circumstances afford, we will consider these conveyances each in its order.

1. Among the debts due by Charles D. Blanton was a note for $4,500, dated December 14, 1892, to the National Bank of Asheville, on which William M. Blanton was indorser. After negotiations, complicated with details fully set forth in the testimony, with which it is unnecessary to cumber this opinion, this note was liquidated by the conveyance of the South Muddy Creek farm. This farm, upon which William M. Blanton lived prior to his removal to Marion, was made up of several tracts of land, the first of which was bought in 1859 or 1860. Inasmuch as the decision on this branch of the case turns upon it, the testimony relating to the purchase will be given as it appears in the record:

"Q. Where did you get the money that paid for the farm? A. I furnished some myself, and my wife furnished some of it. Q. How much did your wife furnish? A. I think a little over $400 at the time, in 1860. In 1860 she furnished $600. In 1884 or 1885 she furnished $200. Q. Where did she get that money? A. From her father, David Setzer. Q. What did he give her that money for? A. To help me buy that land. Q. Who were you to buy it for with the money you got from him? A. It was his and her understanding and mine that I was to buy it for her."

There was testimony that some of the later purchases were of more value than the earlier, and also testimony going to show that David Setzer had furnished some money as he had done for another daughter, and also testimony that the wife had always claimed an interest in the land, and the defendant Blanton claimed that that interest amounted to one-half interest, and in consideration of the surrender of that half interest in liquidation of the debt to the bank he conveyed to her the lot and house in which he lived in the town of Marion. There is testimony tending to show that the house and lot in the town of Marion was of greater value than that set upon it by the defendants, but the preponderance of testimony is that the house and lot in Marion was not worth more than the one-half interest in the South Muddy Creek farm. The conveyance of the house and lot in Marion is one of those sought to be set aside, and the question for decision is whether the claim of the wife to one-half interest in the farm lands is a valuable consideration, sufficient to support the deed. Assuming, as the testimony fairly warrants, that the one-half interest in the farm was about equal in value to the house and lot, the case will be considered as if it were a proceeding to set up an interest in the farm lands in behalf of the wife, and must be determined in accordance with the laws of North Carolina. A part of the money claimed to have been invested in lands for her benefit was invested prior to the adoption of the constitution of that state, in 1868, which provides, in article 10, § 6, that "real and personal property of any female in this state acquired before marriage and all property real and personal to which she may, after marriage, become in any manner entitled, shall be and remain the sole and separate estate and

property of such female." Chief Justice Merrimon in Walker v. Long, 109 N. C. 513, 14 S. E. 300, citing this provision and the pertinent legislation in harmony with it, says:

"As to her separate property, however acquired, she and her husband are, as to property rights and estates, not to be recognized and treated in legal contemplation as one person. She is an unmarried woman; it is so expressly provided."

As to so much of the money as was laid out in land subsequent to the adoption of this constitution, the case presents no difficulty, and the testimony shows that the Higgins tract, bought in September, 1869, for $1,200, of which amount the wife furnished $600, was worth as much as the remainder of the farm. By the law of North Carolina, prior to the adoption of the constitution of 1868, the husband—jus mariti—became entitled to all of the personal property of the wife which came into his possession; not so as to real estate or the proceeds of real estate. The testimony of Blanton is that the money which David Setzer gave to his daughter in 1860 was to be invested in land for her benefit, and that it was so invested. If so, the marital rights never attached, the husband having no marital rights in David Setzer's money. Taking as true the testimony of Blanton, that, at the time David Setzer gave this money to his daughter, in 1860 (and there is nothing in the record contradicting it), "it was his and her understanding and mine that I was to buy it (the land) for her," then the money went into his hands clothed with a trust, and there is a resulting trust in the lands for the benefit of the wife, and this view seems in consonance with the opinions of the supreme court of North Carolina. The learned counsel for the plaintiffs has cited some cases which might lead to another conclusion, but the facts may be differentiated. In Hackett v. Shuford, 86 N. C. 151, and in Kirkpatrick v. Holmes, 108 N. C. 206, 12 S. E. 1037, there was no agreement at the time the money was received that it was to be invested for the wife. In the case last cited Shepherd, J., held that the proceeds of sale of wife's lands before 1868 became the property of the husband, "if he received it without any special agreement to invest it for her benefit." The converse would seem to be true if there was a special agreement. If he received it after 1868, the proceeds would be her separate estate, and if it went into the hands of her husband, and he invested it in land, taking title in his own name, as was the case here, in the absence of an agreement to the contrary, a trust would have resulted to her. And the same learned Judge in Beam v. Bridgers, 108 N. C. 277, 13 S. E. 113, says: "It is a well-settled principle that where, in the purchase of property, the conveyance of the legal title is taken in the name of one person, but the purchase money is paid by another at the same time or previously, and as a part of the one transaction, a trust results in favor of him who supplies the purchase money,"—citing Adams' Eq. 33; Malcolm, Real Prop. 509,—and the principle has been frequently applied where land is purchased with funds arising from the separate estate of the wife. In Giles v. Hunter, 103 N. C. 201, 9 S. E. 549, moneys arising from the sale of wife's land was, with her consent, paid over to the husband, who invested it in other lands, with no request on her part that the land purchased should be con-

veyed to her or for her benefit, and the husband took title in himself. It was held that the land vested absolutely in him discharged of any equity in her. In all of the North Carolina cases examined, wherever it appears that the wife's money was invested in lands under an agreement that it was to be for her benefit, the courts have held that there was a resulting trust. In Dula v. Young, 70 N. C. 451, John Witherspoon (in 1842) in right of his wife was seised of a certain tract of land, which he sold under agreement with his wife that he would buy another tract. This he took in his own name, and upon his death it was sold by his administrator to pay debts. The agreement between the husband and wife was not in writing. It was held that the children of his wife, Elizabeth, were entitled to the land. The demand of Elizabeth Witherspoon, says the court, did not rest upon the moral duty or voluntary bounty of her husband, but, having parted with her own lands, she was entitled to say, "I have paid valuable consideration." In Lyon v. Akin, 78 N. C. 258, a husband, in 1848, purchased land, paying for it in money belonging to his wife, part of it being proceeds of real estate descended from her father, and took title in his own name, which he mortgaged in 1861. It was held (in 1878) that there was a resulting trust in favor of the wife, whose money paid for it. In Brisco v. Norris, 112 N. C. 676, 16 S. E. 850, a husband purchased land with the separate estate of the wife, and title was taken in his name, with agreement that he would convey same to her when requested. Merchandise was sold to a firm of which he was a member upon his credit, and testimony was offered to show that nobody knew of any claim upon the lands, which had been in his possession for 20 or 21 years. When the claim of the creditors was put in the hands of lawyers, in 1869, and was being pressed, he conveyed the land to his wife. Burwell, J., delivering the opinion of the court, held that the husband held the land as trustee for the wife. In Garner v. Bank, 151 U. S. 420, 14 Sup. Ct. 390, the supreme court of the United States, reviewing the decisions in Rhode Island, where the property was situate, in a case where a husband invested a part of the separate estate of his wife in real estate without her knowledge or consent, taking title in his own name, and on this coming to her knowledge, after a lapse of time, she required it to be conveyed to her, the husband at the time of the conveyance being insolvent, held (reversing the decree of the lower court) that the wife's equities in the estate were superior to those of the husband's creditors, if it does not appear that the creditors were induced to regard him as the owner of it by reason of representations to that effect either by him or by her. On page 434, 151 U. S., and on page 395, 14 Sup. Ct., the court, after reviewing the facts, says:

"The conveyance to Garner, followed by his conveyance to her, was executed for the purpose of discharging the husband's obligations to the wife, and were made before any creditor acquired a lien on the property by attachment. As between the husband and wife, a court of equity would have compelled him to secure this property to her. If, before any rights of attaching creditors intervened, he did voluntarily what the law made it his duty to do, the transaction is not subject to impeachment by his creditors unless the wife has been guilty of such fraudulent conduct as ought in conscience to estop her from claiming the property as against such creditors. If the wife has been guilty of deception, or if she had contributed to its success by countenancing it, she

might with justice be charged with the consequences of her conduct. But the evidence furnishes no ground for the imputation of fraud against her."

The case of Humes v. Scruggs, 94 U. S. 22, was considered, and, as it is relied on here, it may be as well to say that the court found that the proof showed a state of the case the reverse of that claimed by the wife, and here, as there, we may repeat that "the observations of the court in Humes v. Scruggs have no application to the facts that we consider to be established by the proofs in the present case." Nor is it conceived that the observations of the court in Olcott v. Bynum, 17 Wall. 59, that no trust arises unless the money "is paid for some aliquot part of the property, as a fourth, a third, or a moiety," should avail, under the circumstances of this case, to defeat the just claims of the wife. There is no such uncertainty as to the proportion of the property to which the trust extends. It extends to the value of the lands purchased with the money of the wife, and under the proofs it cannot be said that one-half of the value of the farm would be so disproportioned to the extent of the trust that the whole should be defeated. Where a conveyance is attacked on the ground of fraud, proof of carelessness and confusion in dealings make rather against than in favor of the claim of fraud, if upon the main issue the court is satisfied that the transaction is grounded upon good faith, and as rights allowed in accordance with the principles of equity do not depend upon, they should not be defeated by, nice calculations. I am of opinion that the conveyance of the house and lot in the town of Marion to the wife, Josephine Blanton, was made bona fide, and for good consideration, and that it cannot be impeached for fraud. Even if it were true that the wife's interest in the Muddy Creek farm was worth slightly less than the consideration expressed, mere inadequacy of consideration in honest family settlements is not a badge of fraud. Bump, Fraud. Convey. (4th Ed.) p. 45; Holden v. Burnham, 63 N. Y. 74.

2. The conveyance of the Ed Justice house and lot and of two other small houses and lots in the town of Marion, for the consideration of $3,500, must likewise be sustained. The only ground of impeaching the transaction seems to rest upon the suspicion that there must be something wrong because one of the brothers of the defendant Blanton was a partner of the firm of H. D. Lee & Co. There is no doubt that the debts were due, and that the lots were sold for their full value. S. J. Green, a member of the firm of H. D. Lee & Co., testifies that on the day the property was bought they would have "sold it for cash for $500 less than the amount it was valued to them at." In the absence of a statute forbidding preferences, a debtor in failing circumstances may prefer one creditor to another. Payment of debt to one creditor is no fraud upon the other creditors,—no legal injury to them. If there is a true debt, and a real transfer for adequate consideration, and no secret understanding in derogation of the ostensible alienation, it must be sustained; for fraud consists, not in preferring one creditor to another, but in the intention to prefer one's self to all creditors. The law cannot take cognizance of the feelings which prompt the preference, and if the act is right the motive which induces it cannot change the character.

3. The conveyance of the defendant's (Blanton's) interest in the Huthsleiner place to W. McD. Burgin must likewise be sustained. It seems to have been made bona fide and for valuable consideration, and there appears no ground for impeaching it. The note received by Blanton as the consideration should be turned over to the clerk of this court for collection under the direction of the solicitors in the cause, and the proceeds held for further order.

4. The conveyance of the tanyard property to J. L. Morgan stands upon a different footing. At the time that it was made one Lowman was pressing for the payment of a debt of about $1,000, and the defendant Blanton was endeavoring to secure a reduction of the claim. Conveyances of property under such circumstances cannot be sustained. They fall under the condemnation of the law as laid down in Peeler v. Peeler, 109 N. C. 633, 14 S. E. 59. Any conveyance whose object or manifest tendency is to hinder, delay, or defeat a creditor falls within the meaning of the statute. If the object is to compel the creditor to accept a compromise by putting hindrances in his way, or to embarass him by delay, or to subject him to expense or trouble in the recovery of what is justly due, it is equally to be condemned. If void as to one creditor, it is void as to all, and this conveyance must be set aside; but inasmuch as it appears that J. L. Morgan, as part of the purchase money, paid the debt of Lowman in full as well as some other debts of the defendant Blanton, and as it does not appear that he was so far a participator in the unlawful conduct of the defendant Blanton as to disentitle him to all consideration, it is adjudged that he be reimbursed from the proceeds of sale so much money as he has actually paid out on the debt of Lowman and other bona fide indebtedness of William M. Blanton.

5. The conveyance of the storehouse and lot and stock of goods to J. D. Blanton must fall within like condemnation to that last mentioned, but, inasmuch as it sufficiently appears that J. D. Blanton has paid out, on the bona fide indebtedness of William M. Blanton, an amount equal to the value of the stock of goods, no good purpose could be served by further accounting on that score. The conveyance of the house and lot is set aside, but as the testimony shows that the buildings on the lot have been destroyed by fire, and a new building erected on the premises in part with moneys advanced by the widow of W. P. Blanton, with whom J. D. Blanton became associated in business subsequent to the transaction herein condemned,— and as the said widow was in no wise implicated in the same, it is adjudged that she have a lien on the premises to the amount of the moneys expended out of her estate in the erection of the building now standing thereon. The costs will abide the further order of the court.