VOORHEIS et al. v. BLANTON et al.

BLANTON et al. v. VOORHEIS et al.

(Circuit Court of Appeals, Fourth Circuit. November 1, 1898.)

No. 257.

1. FRAUDULENT CONVEYANCES—DEED TO WIFE—CONSIDERATION.
Under the law as it existed in North Carolina prior to the adoption of the constitution of 1868, by which a husband was vested with the ownership of the personal property of his wife which came into his possession, but not with her realty, money which was given to a husband by his wife's father, to be invested in land for the wife, was clothed with a trust, and did not become the husband's property; and a resulting trust arose in favor of the wife in the land when purchased, though title was taken in the husband, who paid a part of the purchase money, which interest of the wife was a sufficient consideration to support a subsequent conveyance to her by her husband of other property.

2. SAME—PURPOSE TO DELAY CREDITOR.
A conveyance of property by a debtor for the purpose of compelling a creditor to compromise by the hindrance and delay thereby occasioned is voidable as to all creditors.

3. SAME—SUIT BY CREDITORS—EQUITABLE LIENS.
Where, after a voluntary conveyance of a building and lot by a debtor, which was voidable as to his creditors, the building was destroyed by fire, and restored in part with the money of the grantee's partner, who had no connection with the fraud, in setting aside the conveyance at the suit of creditors such partner will be allowed a lien for the amount so advanced.

Cross Appeals from the Circuit Court of the United States for the Western District of North Carolina.

This was a suit in equity by Voorheis, Miller & Co. against William M. Blanton and others to set aside certain conveyances alleged to have been made in fraud of creditors. From the decree entered by the circuit court both parties appeal.

James H. Merrimon. for Voorheis, Miller & Co.

E. H. Justice, for Blanton and others.

Before GOFF and SIMONTON, Circuit Judges, and MORRIS, District Judge.

GOFF, Circuit Judge. The plaintiffs below, Voorheis, Miller & Co., filed their bill in equity in the circuit court of the United States

for the Western district of North Carolina, the object of which was to set aside, and have decreed to be null and void, certain conveyances of real estate made by the defendants William M. Blanton and Josephine Blanton, his wife, to the other defendants, and by said William M. Blanton to his said wife, upon the ground that they were made to hinder, delay, and defraud the creditors of the said William M. Blanton. The cause was duly matured, and came on for final hearing before the Hon. William H. Brawley, United·States district judge for the district of South Carolina, who had been assigned, under the provisions of the law in such cases made and provided, to hold a special term of the United States circuit court for the Western district of North Carolina. On the 7th day of December, 1897, he entered a decree in said cause, by which several of the conveyances complained of were held to be valid, while others were decreed to be null and void. From this decree the plaintiffs appealed, alleging as error the finding of the court below that the deed made on the 17th day of April, 1893, by William M. Blanton to his wife, Josephine Blanton, was for a valuable consideration, and valid in law; and also alleging error in the decree, in that it sustained the validity of the deeds made by said Blanton and wife to H. D. Lee & Co. and to William McD. Burgin. From said decree the defendants also appealed, alleging as error the order of the court setting aside the deeds made by said William M. Blanton and wife to J. L. Morgan and to J. D. Blanton, respectively. Other assignments of error in the cross appeals we do not deem it necessary to specially refer to.

As to the law applicable in this case there is no controversy, and a careful examination of all the evidence forces us to the same result reached by the learned judge who rendered the decree complained of. The opinion filed by him, clearly stating the law as it does, fully considering and analyzing the evidence, has our full concurrence, and we quote it herewith as the conclusion reached by this court. It is as follows:

"This is a bill to set aside certain conveyances as fraudulent. The plaintiffs are merchants in Cincinnati, Ohio, who sold a bill of goods to C. D. Blanton & Co., merchants doing business at Asheville, N. C., and the defendant Wm. M. Blanton, with others, guarantied the payment of the same. Wm. M. Blanton was a farmer, residing in McDowell county, on what is hereinafter called 'South Muddy Creek Farm,' in McDowell county, North Carolina, until about the year 1878, when he moved to the town of Marion, in the same state, where he engaged in merchandising, and is now about sixty-five years of age. He became a partner with his son Charles, who was doing business at Asheville under the name of C. D. Blanton & Co. Some time before the transactions hereinafter related, he gave his interest in ·that business to a younger son, Josephus, but there was no publication of his withdrawal from that firm until after the accrual of the indebtedness which is the subject of this controversy. Charles D. Blanton became greatly involved in debt outside of his mercantile obligations, and his father was surety for a considerable amount. In December, 1892, Charles D. Blanton sold the stock of goods of C. D. Blanton & Co., in Asheville, to J. D. Brevard, for $16,000, under a bill of sale which provided that the proceeds should be applied to the payment of certain debts of C. D. Blanton & Co. While a controversy subsequently arose, and it was disputed whether the debt to the plaintiffs was among those provided for in this bill of sale, I am satisfied from the testimony that Wm. M. Blanton at the time believed that it was so provided for, and that he believed that the amount of $16,000, the purchase

price of the stock of goods, was ample to pay all the debts of C. D. Blanton & Co. for which he was liable as indorser or guarantor. Subsequent events have demonstrated that he was mistaken in this conclusion. The debt of the plaintiff's remains unpaid, the property of Wm. M. Blanton has been disposed of, and this suit is for the purpose of inquiry into such disposition of it, and to set aside all of the conveyances as fraudulent.

"While it might be that a court would feel itself compelled to set aside conveyances as in fraud of creditors, although there was no intention at the time to defraud a particular creditor, it cannot, in fairness, determine the character of a series of transactions without inquiry into the motive which impelled them, and entering as far as may be into the state of mind of the chief actor therein. I find sufficient testimony to support the conclusion that at the time when Wm. M. Blanton commenced to dispose of his property in the manner to be hereinafter specifically considered he was of the opinion, founded upon what, to him, was sufficient ground for the belief, that the plaintiffs' debt was already provided for; and it may be as well to say further that no statute of the state of North Carolina has been cited forbidding preferences among creditors, and these conveyances are not contested on that ground. Here, then, we have an old man, who finds himself, in his declining years, involved as surety for his son in indebtedness which had already absorbed part of his fortune, and which was sufficient to sweep away all of his property. On the part of the plaintiffs it is contended that, confronted by these conditions, he straightway devised and executed such disposition of it as would secure for himself such ease and comfort as could be provided, and it must be admitted that the temptation so to do was sore, and such as human experience teaches us is often sufficient to swerve good men from the straight and narrow way. On the part of the defendant it is contended that, having led a life of industry and integrity which has secured for him the respect and confidence of his fellows, his first and controlling thought was so to dispose of the remnant of his property as to pay all of his debts upon the best terms that he could secure, and thus become a free man again, maintaining his own self-respect and that of his fellow men. The great searcher of hearts alone can know with absolute certainty which theory is right,— that of the plaintiff or that of the defendant. Without that guidance, and with such side lights as circumstances afford, we will consider these conveyances each in its order.

"1. Among the debts due by Charles D. Blanton was a note for $4,500, dated December 14, 1892, to the National Bank of Asheville, on which Wm. M. Blanton was indorser. After negotiations, complicated with details fully set forth in the testimony, with which it is unnecessary to cumber this opinion, this note was liquidated by the conveyance of the South Muddy Creek farm. This farm, upon which Wm. M. Blanton lived prior to his removal to Marion, was made up of several tracts of land, the first of which was bought in 1859 or 1860. Inasmuch as the decision of this branch of the case turns upon it, the testimony relating to the purchase will be given as it appears in the record: 'Q. Where did you get the money that paid for the farm? A. I furnished some myself and my wife furnished some of it. Q. How much did your wife furnish? A. I think a little over $400 at the time in 1860. In 1869 she furnished $600: in 1884 or 1885 she furnished $200. Q. Where did she get that money? A. From her father, David Setzer. Q. What did he give her that money for? A. To help buy that land. Q. Who were you to buy it for with the money you got from him? A. It was his and her understanding and mine that I was to buy it for her.' There was testimony that some of the later purchases were of more value than the earlier, and also testimony going to show that David Setzer had furnished some money as he had done for another daughter, and also testimony that the wife had always claimed an interest in the land; and the defendant Blanton claimed that that interest amounted to one-half interest, and in consideration of the surrender of that half interest in liquidation of the debt to the bank he conveyed to her the lot and house in which she lived in the town of Marion. There is testimony tending to show that the house and lot in the town of Marion was of greater value than that set upon it by the defendants, but the preponderance of testimony is that the house and lot in Marion was not worth

more than the one-half interest in the South Muddy Creek farm. The conveyance of the house and lot in Marion is one of those sought to be set aside, and the question for decision is whether the claim of the wife to one-half interest in the farm lands is a valuable consideration sufficient to support the deed. Assuming, as the testimony fairly warrants, that the one-half interest in the farm was about equal in value to the house and lot, the case will be considered as if it were a proceeding to set up an interest in the farm lands in behalf of the wife, and must be determined in accordance with the laws of North Carolina. A part of the money claimed to have been invested in lands for her benefit was invested prior to the adoption of the constitution of that state in 1868, which provides in article 10, § 6, that 'real and personal property of any female in this state, acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and remain the sole separate estate and property of such female.' Chief Justice Merrimon, in Walker v. Long, 109 N. C. 513, 14 S. E. 300, citing this provision, and the pertinent legislation in harmony with it, says: 'As to her separate property, however acquired, she and her husband are, as to property rights and estates, not to be recognized and treated in legal contemplation as one person. She is an unmarried woman. It is so expressly provided.' As to so much of the money as was laid out in land subsequent to the adoption of this constitution, the case presents no difficulty, and the testimony shows that the Higgins tract, bought in September, 1869, for $1,200, of which amount the wife furnished $600, was worth as much as the remainder of the farm. By the law of North Carolina prior to the adoption of the constitution of 1868, the husband—jus' mariti—became entitled to all of the personal property of the wife which came into his possession; not so as to real estate, or the proceeds of real estate. The testimony of Blanton is that the money which David Setzer gave to his daughter in 1860 was to be invested in land for her benefit, and that it was so invested. If so, the marital rights never attached, the husband having no marital rights in David Setzer's money. Taking as true the testimony of Blanton that at the time David Setzer gave this money to his daughter in 1860 (and there is nothing in the record contradicting it), 'it was his and her understanding and mine that I was to buy it [the land] for her,' then the money went into his hands clothed with a trust, and there is a resulting trust in the lands for the benefit of the wife; and this view seems in consonance with the opinions of the supreme court of North Carolina. The learned counsel for the plaintiff has cited some cases which might lead to another conclusion. but the facts may be differentiated.

"In Hackett v. Shuford, 86 N. C. 151, and in Kirkpatrick v. Holmes, 108 N. C. 206, 12 S. E. 1037, there was no agreement, at the time the money was received, that it was to be invested for the wife. In the case last cited, Shepherd, J., held that the proceeds of sale of wife's land before 1868 became the property of the husband 'if he received it without any special agreement to invest it for her benefit.' The converse would seem to be true, if there was a special agreement. If he received it after 1868, the proceeds would be her separate estate; and if it went into the hands of her husband, and he invested it in land, taking title in his own name,—as was the case here,—in the absence of an agreement to the contrary, a trust would have resulted to her. And the same learned judge, in Beam v. Bridgers, 108 N. C. 277, 13 S. E. 113, says: 'It is a well-settled principle that where, in the purchase of property, the conveyance of the legal title is taken in the name of one person, but the purchase money is paid by another at the same time or previously, and as a part of the one transaction, a trust results in favor of him who supplies the purchase money,'—citing Adams, Eq. 33; Malone, Real Prop. 509; and the principle has been frequently applied where land is purchased with the funds arising from the separate estate of the wife.

"In Giles v. Hunter, 103 N. C. 201, 9 S. E. 549, money arising from the sale of wife's land was, with her consent, paid over to the husband, who invested it in other lands, with no request on her part that the land purchased should be conveyed to her, or for her benefit; and the husband took title in himself. It was held that the land vested absolutely in him, discharged of any equity in her.

"In all of the North Carolina cases examined, wherever it appears that the wife's money was invested in lands, under an agreement that it was to be for her benefit, the courts have held that there was a resulting trust. In Dula v. Young, 70 N. C. 451, John Witherspoon (in 1842), in right of his wife, was seised of a certain tract of land, which he sold under agreement with his wife that he would buy another tract. This he took in his own name, and upon his death it was sold by his administrator to pay debts. The agreement between the husband and wife was not in writing. It was held that the children of his wife, Elizabeth, were entitled to the land. 'The demand of Elizabeth Witherspoon,' says the court, 'did not rest upon the moral duty or voluntary bounty of her husband; but, having parted with her own lands, she was entitled to say "I have paid valuable consideration." '

"In Lyon v. Akin, 78 N. C. 258, a husband, in 1848, purchased land, paying for it in money belonging to his wife, part of it being proceeds of real estate descended from her father, and took title in his own name, which he mortgaged in 1861. It was held, in 1878, that there was a resulting trust in favor of his wife, whose money paid for it.

"In Brisco v. Norris, 112 N. C. 676, 16 S. E. 850, a husband purchased land with separate estate of wife, and title was taken in his name with agreement that he would convey same to her when requested. Merchandise was sold to a firm of which he was a member, upon his credit, and testimony was offered to show that nobody knew of any claims upon the lands, which had been in his possession for twenty or twenty-one years. When the claim of the creditors was put in the hands of lawyers, in 1869, and was being pressed, he conveyed the land to his wife. Burwell, J., delivering the opinion of the court, held that the husband held the land as trustee for the wife.

"In Garner v. Bank, 151 U. S. 420, 14 Sup. Ct. 390, the supreme court of the United States, reviewing the decisions in Rhode Island, where the property was situated, in a case where a husband invested a part of the separate estate of his wife in real estate without her knowledge and consent, taking title in his own name, and on this coming to her knowledge, after a lapse of time, she required it to be conveyed to her, the husband at the time of the conveyance being insolvent, held (reversing the decree of the lower court) that his wife's equities in the estate were superior to those of the husband's creditors, if it does not appear that the creditors were induced to regard him as the owner of it by reason of representations to that effect, either by him or by her. On page 434, 151 U. S., and page 395, 14 Sup. Ct., the court, after reviewing the facts, says: 'The conveyance to Garner, followed by his conveyance to her, was executed for the purpose of discharging the husband's obligations to the wife, and was made before any creditor acquired a lien on the property by attachment. As between the husband and wife, a court of equity would have compelled him to secure this property to her. If, before any rights of attaching creditors intervened, he did voluntarily what the law made it his duty to do, the transaction is not subject to impeachment by his creditors, unless his wife has been guilty of such fraudulent conduct as ought, in conscience, to estop her from claiming the property as against such creditors. If the wife had been guilty of deception, or if she had contributed to its success by countenancing it, she might, with justice, be charged with the consequences of her conduct. But the evidence furnishes no grounds for the imputation of fraud against her.'

"The case of Humes v. Scruggs, 94 U. S. 22, was considered, and, as it is relied upon here, it may be as well to say that the court found that the proof showed a state of the case the reverse of that claimed by the wife; and here, as there, we may repeat that 'the observations of the court in Humes v. Scruggs have no application to the facts that we consider to be established by the proof in the present case.' Nor is it conceived that the observations of the court in Olcott v. Bynum, 17 Wall. 59, that no trust arises unless the money 'is paid for some aliquot part of the property,—as a fourth, a third, or a moiety,'—should avail, under the circumstances of this case, to defeat the just claims of the wife. There is no such uncertainty as to the proportion of the property to which the trust extends. It extends to the value of the lands purchased with the money of the wife, and under the proofs it cannot be said that one-half of the value of the farm would

be so disproportioned to the extent of the trust that the whole should be defeated. Where a conveyance is attacked on the ground of fraud, proof of carelessness and confusion in dealings make rather against than in favor of the claim of fraud, if upon the main issue the court is satisfied that the transaction is grounded upon good faith; and, as rights allowed in accordance with the principles of equity do not depend upon, they should not be defeated by, nice calculations.

"I am of opinion that the conveyance of the house and lot in the town of Marion to the wife, Josephine Blanton, was made bona fide, and for good consideration, and that it cannot be impeached for fraud. Even if it were true that the wife's interest in the Muddy Creek farm was worth slightly less than the consideration expressed, here inadequacy of consideration in honest family settlements is not a badge of fraud. Bump, Fraud. Conv. (4th Ed.) p. 45; Holden v. Burnham, 63 N. Y. 74.

"2. The conveyance of the Ed. Justice house and lot, and of two other small houses and lots, in the town of Marion, for the consideration of $3,500, must likewise be sustained. The only ground of impeaching the transaction seems to rest upon the suspicion that there must be something wrong, because one of the brothers of the defendant Blanton was a partner of the firm of H. D. Lee & Co. There is no doubt that the debts were due, and that the lots were sold for their full value. S. J. Green, a member of the firm of H. D. Lee & Co., testifies that on the day the property was bought they would have 'sold it for cash for $500 less than the amount it was valued to them at.' In the absence of a statute forbidding preferences, a debtor in failing circumstances may prefer one creditor to another. Payment of debt to one creditor is no fraud upon the other creditors, no legal injury to them. If there is a true debt, and a real transfer for adequate consideration, and no secret understanding in derogation of the ostensible alienation, it must be sustained, for fraud consists, not in preferring one creditor to another, but in the intention to prefer one's self to all creditors. The law cannot take cognizance of the feelings which prompt the preference, and, if the act is right, the motive which induces it cannot change the character.

"3. The conveyance of the defendant Blanton's interest in the Huthsteiner place to W. McD. Burgin must likewise be sustained. It seems to have been a bona fide transaction for valuable consideration, and there appears no ground for impeaching it. The note received by Blanton as the consideration should be turned over to the clerk of this court for collection, under the direction of the solicitors in the cause, and the proceeds held for further order.

"4. The conveyance of the tanyard property to J. L. Morgan stands upon a different footing. At the time that it was made, one Lowman was pressing for the payment of a debt of about $1,000, and the defendant Blanton was endeavoring to secure a reduction of the claim. Conveyances of property under such circumstances cannot be sustained. They fall under the condemnation of the law as laid down in Peeler v. Peeler, 109 N. C. 633, 14 S. E. 59. Any conveyance whose object or manifest tendency is to hinder, delay, or defeat a creditor falls within the meaning of the statute. If the object is to compel the creditor to accept a compromise by putting hindrances in his way, or to embarrass him by delay, or to subject him to expense or trouble in the recovery of what is justly due, it is equally to be condemned. If void as to one creditor, it is void as to all, and this conveyance must be set aside; but, inasmuch as it appears that J. L. Morgan, as part of the purchase money, has paid the debt of Lowman in full, as well as some other debts of the defendant Blanton, and as it does not appear that he was so far a participator in the unlawful conduct of the defendant Blanton as to disentitle him to all consideration, it is adjudged that he be reimbursed from the proceeds of sale so much money as he has actually paid out on the debt of Lowman and other bona fide indebtedness of Wm. M. Blanton.

"5. The conveyance of the storehouse and lot and stock of goods to J. D. Blanton must fall within like condemnation to that last mentioned, but, inasmuch as it sufficiently appears that J. D. Blanton has paid out on the bona fide indebtedness of Wm. M. Blanton an amount equal to the value of the stock of goods, no good purpose could be served by further accounting

on that score. But the conveyance of the house and lot is set aside. Still, as the testimony shows that the buildings on the lot have been destroyed by fire, and a new building erected on the premises, in part with moneys advanced by the widow of W. P. Blanton, with whom J. D. Blanton became associated in business subsequently to the transaction herein condemned, and as she was in no wise implicated in the same, it is adjudged that she have a lien on the premises to the amount of the moneys expended out of her estate in the erection of the buildings now standing thereon. The costs will abide the further order of the court."

It was clearly the intention of the judge entering the decree appealed from to provide (as, under the circumstances attending these transactions, it was equitable that he should) for the protection of those who, without fraud on their part, had paid their money on their respective purchases in satisfaction of the bona fide indebtedness of the defendant William M. Blanton, and the court below, to which this cause will be remanded for such further proceeding as may be proper under this opinion, will see that such intention is carried out, and, in order to do so, will, if necessary, bring before it such other parties as may be required. We find no error in the decree complained of, and the same is affirmed.