BLOUNT, et al. *v.* BLOUNT

No. 40334 June 3, 1957 95 So. 2d 545

July 3, 1957 96 So. 2d 232

*Ethridge, Minniece & Bourdeaux,* Meridian, for appellant, *H. E. Blount.*

*Laurel G. Weir,* Philadelphia, for appellant, *Thomas H. Blount.*

402

W. *D. Moore, J. B. Hillman,* Philadelphia, *H. Grady Stamper,* Union; *A. E. Hawkins,* Houston, for appellee.

KYLE, J.

This appeal is from a decree of the Chancery Court of Neshoba County in three cases which were consolidated for trial by agreement of the parties. The appellee, Mrs. Billie Ruth Blount, was complainant in each of the three cases. The first suit, docketed in the lower court as Cause No. 4391, was a suit for divorce and alimony filed by the appellee against her husband, the appellant Thomas H. Blount. The second suit, which was docketed in the lower court as Cause No. 4403, was a suit filed by the appellee against the appellants Thomas H. Blount and his father, H. E. Blount, to set aside certain deeds of conveyance of lands executed by Thomas H. Blount to his father, which the appellee alleged had been executed for the purpose of defrauding the appellee of her right to alimony and support for her two minor children, and to require an accounting for personal property turned over to H. E. Blount by Thomas H. Blount, in which the appellee claimed an interest. The third suit, Cause No. 4446, was a suit filed by the appellee against the appellants, Thomas H. Blount and H. E. Blount, seeking to establish the appellee's claim to an undivided one-half interest in the personal property transferred by Thomas H. Blount to his father immediately after the separation of the appellee from her husband.

The bill of complaint in the divorce suit was filed on June 1, 1954. The bill alleged and the record shows that the complainant and the defendant, Thomas H. Blount, were married on September 14, 1947, and that they lived together, except for a short period of time, from that date until May 26, 1954. Two children were born of the marriage, Thomas Chandler Blount and Marcie Jean Blount, who were 4½ years of age and 2 years of age,

respectively, at the time of the filing of the bill of complaint. The complaint alleged in her bill as ground for divorce habitual cruel and inhuman treatment extending over a period of approximately two and one-half years; and the complainant asked for a decree of divorce and for the temporary and permanent care and custody of the two minor children, and also for alimony and a support allowance for the support and maintenance of the two children. The complainant alleged in her bill that the defendant was the owner of approximately 900 acres of land in Neshoba County, a dairy barn and approximately 130 to 150 head of cattle, also tractors, a truck and other personal property, all of the value of approximately $100,000; and the complainant asked that a lien be impressed upon the property owned by the defendant to secure the payment of the alimony, and that she be awarded the immediate possession of the home, and that the defendant be enjoined from entering upon the premises and disturbing the complainant and the two children.

The day after the divorce suit was filed the chancellor signed an order fixing June 12 as the date for a hearing on the complainant's application for the custody of the two minor children and for temporary alimony; and a summons was issued for the defendant commanding him to appear at the time and place stated in the order, to show cause why the custody of the two children should not be awarded to the complainant, and why the defendant should not be required to pay the complainant a reasonable sum of money for the support of herself and the two children pending a hearing of the case on its merits. The defendant eluded service of process, however, and the summons was never served. A supplemental order was entered thereafter fixing a new date for such hearing, but the defendant had left the state, taking the children with him, and no such hearing was held. The defendant was finally located in Cuba, Alabama, about the

middle of July, and the complainant filed a petition for a writ of habeas corpus in that state to obtain possession of the children. The writ was granted, and after a hearing the Alabama Court awarded the custody of the children to the complainant, who brought them back to their home in Philadelphia. But three weeks later the defendant appeared at a street intersection in Philadelphia, with his face blacked and wearing overalls, and seized his 4½-year old son while he was seated in an automobile beside his mother, and escaped with the boy in a waiting truck; and a few nights later the defendant forced his way into the complainant's home and obtained possession of his 2-year old daughter. On August 23 the chancellor signed an order directing the issuance of a writ of ne exeat. But the defendant had left the state again, and the writ was never served.

After four months of travel which carried him as far west as Albuquerque, New Mexico, and Las Vegas, Nevada, the defendant left his two children with comparative strangers in Marshall, Texas, and returned to Meridian, Mississippi, during the last week in November. He was immediately arrested and incarcerated in the county jail. A new writ of ne exeat was issued, and the defendant was required to execute bond in the sum of $10,000, conditioned that he would remain within the jurisdiction of the court; and after a hearing on December 6 the chancellor entered a decree awarding to the complainant the immediate custody of the two children and requiring the defendant to pay to the complainant the sum of $200 per month as temporary alimony for the support of herself and the two children.

The bill of complaint in Cause No. 4403 was filed on July 3, 1954. In her bill in that case the complainant sought to have the court set aside two deeds of conveyance of lands executed by Thomas H. Blount to his father on May 28, 1954, which purported to convey to the said H. E. Blount the 890 acres of land owned by Thomas H.

Blount at the time of the separation. The complainant alleged that the deeds had been executed by the said Thomas H. Blount with the deliberate design and purpose of placing the property beyond the ordinary process of the court, and for the purpose of defrauding and withholding from the complainant and her two minor children their property rights under the law; that the defendants, Thomas H. Blount and H. E. Blount, knew at the time the deeds were executed, or had reason to believe, that the lands described in the deeds would be the subject of litigation which would arise out of the domestic differences that the complainant and the defendant Thomas H. Blount were having at that time; and that the purported transfer of the title to the lands had been made pursuan to a conspiracy by and between the defendant Thomas H. Blount and his father to perpetrate a fraud upon the complainant and the two minor children. The complainant also alleged in her bill that the defendant Thomas H. Blount had turned over to his father all of the cattle and other personal property, which had been accumulated through the joint efforts of both the complainant and the said Thomas H. Blount, and that the defendant H. E. Blount had possession of the cattle and the dairy equipment and was operating the dairy and was selling large quantities of milk, and also cattle and other farm produce; and that the complainant was entitled to a discovery as to the value, kind and amount of said property and to a decree adjudging that she had an equitable interest in all of said property. The complainant asked that the deeds of conveyance of the lands be cancelled and set aside, and that the defendant H. E. Blount be required to pay over to the complainant one-half of the net proceeds of sales of said cattle and milk, which had come into his hands since May 26, 1954. The complainant also prayed for general relief.

The bill of complaint in Cause No. 4446 was filed on September 23, 1954, and in that bill the complainant

sought to establish her claim to an undivided one-half interest in the 150 head of cattle and the farming implements and other personal property which had been turned over to H. E. Blount by her husband after their separation. The complainant also asked for an attachment of said property in the hands of the said H. E. Blount for the enforcement of her claim for the sum of $800, which she had been required to expend for her support and maintenance since the date of the separation.

The defendant, H. E. Blount, filed an answer to the bill of complaint in Cause No. 4403 on November 22, 1954. In his answer the defendant admitted that the defendant, Thomas H. Blount, had conveyed to him the lands described in the deeds dated May 28, 1954, and that the deeds had been filed for record the day after the complainant filed her bill for divorce. The defendant, however, denied that the deeds had been executed by the said Thomas H. Blount with the deliberate design and purpose of placing the property beyond the ordinary process of the court, or for the purpose of defrauding and withholding from the complainant and the two minor children there property rights; and the defendant denied that the transfer of the title to the lands had been made pursuant to a conspiracy between him and his son, Thomas H. Blount, to perpetrate a fraud upon the complainant and her two minor children. The defendant admitted in his answer that he knew at the time the deeds were executed that the complainant and his son were separated and living apart, but the defendant averred that he had every reason to believe that they would become reconciled, since they had been separated before and had become reconciled. The defendant also averred in his answer that the two deeds had been executed for a valuable consideration, that Thomas H. Blount, at the time the deeds were executed, was indebted to him "in an amount exceeding $21,000", and that the defendant had an equitable interest in part of the property by reason of the fact that he had advanced

to the said Thomas H. Blount a part of the purchase price. The defendant admitted that Thomas H. Blount had turned over to him all of the cattle and the dairy equipment owned by him, but denied that the complainant had any interest therein.

The defendant, H. E. Blount, also filed an answer to the bill of complaint in Cause No. 4446, and again denied that the complainant had any interest in the personal property which had been turned over to him by Thomas H. Blount; and the defendant averred that the property had been turned over to him in settlement of the indebtedness owing to him by the said Thomas H. Blount.

The defendant, Thomas H. Blount, filed an answer to the bill for divorce prior to the May 1955 term of the court, and also answers to the two bills relating to the conveyance of the lands by him to his father and the complainant's claim to an undivided one-half interest in the personal property.

The three cases were consolidated for trial at the May term of the court, and after a full hearing the chancellor took the three cases under advisement and rendered his decree on November 8, 1955.

The court found, in Cause No. 4391, that the complainant was entitled to a divorce and the permanent care and custody of the two children. The court found that the defendant was a strong able-bodied man with a good earning capacity, and that he was the owner of the property referred to in the decree, and that he was amply able to provide for the support and maintenance of the complainant and the minor children and to pay a reasonable sum as attorney's fees. The court found in Cause No. 4403, that the allegations of the bill of complaint had been sustained, and that the purported deeds transferring the title to the lands therein described to H. E. Blount should be cancelled, set aside and held for naught, and that a first lien should be impressed on the property

to secure the payments of any and all amounts ordered by the court to be paid by the defendant, Thomas H. Blount, to the complainant, Billie Ruth Blount. In Cause No. 4446, the court found that the complainant had failed to sustain the prayer of her bill to have herself adjudged to be the owner of an undivided one-half interest in the personal property of the defendant, Thomas H. Blount; but the court found that she should be awarded the sum of $800, which represented the amount of money expended by her for and on behalf of herself and the two minor children since the date of her separation from the defendant.

The court found that the defendant, Thomas H. Blount, was guilty of civil contempt of the court on account of his failure to pay the temporary alimony awarded to the complainant; that he was in arrears in the sum of $797.02, plus an additional $255 which was due on May 6, 1955, the day before the hearing on the contempt charge; and that he should be remanded to jail, there to remain until he purged himself of the contempt by paying to the complainant the amount in arrears. The court found that the ne exeat bond in the sum of $10,000 should be continued in full force and effect; and that the defendant should be enjoined from molesting the complainant or her two children at any time or place.

The court therefore decreed that the complainant be granted an absolute divorce and that she have the permanent care and custody of the two minor children, subject to the right of the defendant Thomas H. Blount to visit the children "at reasonable times during daylight and when he is sober," and the defendant was enjoined from molesting the complainant and the children at any time. The court ordered that the defendant pay to the complainant the sum of $800, as sued for in Cause No. 4446, within 5 days; and that he pay to the complainant the sum of $275 per month for the support and maintenance of herself and her two minor children, until fur-

ther order of the court. The court awarded to the complainant the possession of the dwelling house and lot occupied by the parties as a homestead prior to the date of their separation, together with all furnishings and furniture; and the court ordered that the defendant discharge the indebtedness due on the homestead, as the same should mature, and that he maintain fire and casualty insurance on the residence house and furniture for the full insurable value thereof. The court ordered that the defendant pay to the complainant the sum of $750 for solicitor's fees, the same to be paid within thirty days from the date of the decree. The court ordered that the defendant be confined in the Neshoba County jail until he purged himself of the contempt by paying to the complainant the sum of $797.02, plus the additional sum of $255.

The court ordered that the deed to the lands described in the bill of complaint in Cause No. 4403, which had been executed by Thomas H. Blount to H. E. Blount on May 28, 1954, be cancelled, set aside and held for naught, and that a first lien be impressed upon the lands therein described to secure the payment of the sums of money adjudged by the decree to be due and payable or to become due and payable to the complainant, and that the conveyance by Thomas H. Blount to H. E. Blount of the personal property described in the bill of complaint in Cause No. 4403 and Cause No. 4446 be cancelled and set aside. And finally, the court ordered that the ne exeat bond of the defendant Thomas H. Blount, in the amount of $10,000, be continued in full force and effect, and that the defendant be taxed with all costs incurred in the three causes.

From the decree thus rendered the defendants Thomas H. Blount and H. E. Blount, have prosecuted separate appeals.

The appellant, Thomas H. Blount, has appealed from that part of the decree rendered in the divorce suit re-

lating to the allowance of alimony; and in their brief the appellant's attorneys argue that the amount of alimony allowed by the chancellor is unreasonable and excessive. The appellant, Thomas H. Blount, also contends that the court erred in continuing in effect the ne exeat bond, which the appellant was required to execute in order to obtain his release from jail.

The appellant H. E. Blount assigns as errors the following: (1) That the court erred in setting aside the deeds of conveyance of the lands executed by Thomas H. Blount to the appellant H. E. Blount, dated May 28, 1954, without a specific finding that the value of the property conveyed was substantially in excess of the indebtedness shown to be due and owing by Thomas H. Blount to the appellant H. E. Blount; and that even if the court had found that the value of the property was substantially in excess of the indebtedness, the court erred in not awarding the appellant a lien against the property for the amount of the indebtedness alleged and proved; and (2) that the court erred in going beyond the scope of the pleadings and setting aside the conveyance by Thomas H. Blount to the appellant H. E. Blount of the personal property.

In view of the nature of the errors assigned by the appellant, Thomas H. Blount, we shall postpone consideration of those errors until we have disposed of the errors assigned by the appellant H. E. Blount.

In support of their first assignment of errors, the attorneys for the appellant H. E. Blount argue that, since a bona fide indebtedness was shown to be due and owing by Thomas H. Blount to his father at the time the deeds of conveyance of the lands were executed, the chancellor had no right to set aside the deeds without a specific finding that the value of the property conveyed was substantially in excess of the indebtedness.

But we think the chancellor had a right under the facts disclosed by the record in this case to set aside the

conveyances of the lands, and the failure of the chancellor to incorporate in the decree a specific finding that the value of the property conveyed was substantially in excess of the amount of the indebtedness actually due and owing by the grantor to the grantee did not affect the validity of the decree.

Section 265, Code of 1942, provides that every gift, grant or conveyances of lands, goods or chattels, by writing or otherwise, had, or made and contrived to the intent or purpose to delay, hinder, or defraud creditors, shall be deemed and taken ''as against the person or persons * * * whose debts, suits, demands, estates, or interests * * * shall or might be in any wise disturbed, hindered, delayed or defrauded,'' to be clearly and utterly void. Section 267, Code of 1942, provides that the above mentioned section shall not extend to any estate or interest in any lands, goods or chattels, which shall be ''upon good consideration and bona fide'' lawfully conveyed or assured to any person or persons.

The code sections referred to are in effect a restatement of the statute of 13 Elizabeth, c. 5, and as pointed out in Pomeroy's Equity Jurisprudence, Vol. 2, Third Ed., p. 1793, par. 969, ''It should be observed that the statute, by its generality of expression, being without any such limitation, applies to both existing and subsequent creditors, and to both conveyances made upon a valuable consideration and those without any consideration. It does not declare voluntary conveyances void; it only pronounces *fraudulent* conveyances void, whether they are voluntary or made upon a consideration. The validity of a conveyance, as against creditors, is made in the proviso to depend 'upon its being upon a good consideration and *bona fide*'; either is not sufficient; consideration without good faith plainly does not displace the operation of the statute; and good faith without consideration does not necessarily protect a conveyance. A deed made upon a valuable consideration, but not *bona fide*,—that is,

with a fraudulent intent,—is void against creditors of the grantor as though it were voluntary.''

■■ In discussing the effect of the fraudulent intent upon conveyances which come within the purview of the statute the text writer in 37 C. J. S., 960, Fraudulent Conveyances, par. 132, says:

''A conveyance or transfer, whether founded on a valuable and adequate consideration or not, if entered into by the parties thereto with the intent to hinder, delay, or defraud creditors, is void as to them, and this rule has been applied to transfers made in anticipation of, or pending, a suit against the transferor. * * * The law will not permit one man to assist in cheating another, and when it appears that the parties to a transaction impugned for fraud were actuated by a motive which the statute denounces as fraudulent, to wit, to hinder, delay, or defraud creditors, it is utterly immaterial how valuable a consideration may have passed from the grantee or transferee, for the conveyance is none the less void in law.''

In Ames v. Dorroh, 76 Miss. 187, 23 So. 867, 71 Am. St. Rep. 522, the Court said:

''In equity, every person who gives no specific security for the payment of his debts is deemed as holding his property in trust for his creditors, and any conveyance of it by him, without consideration, or *mala fide* if upon consideration, is void as to his creditors, and, as to them, he is considered the owner of such property, and all grantees thereof, who take as volunteers, or without consideration, or who take the same with notice of the trust, are considered in equity trustee *ex maleficio* of such property, and may be made to answer to creditors for said property or for its value. Heath v. Page, 63 Pa. St., 108, Bump on Fraud, Con., p. 14.''

■■ A wife in respect of her right to maintenance or alimony, is within the protection of statutes or the rule

avoiding conveyances or transfers in fraud of creditors or other persons to whom the maker is under legal liability; and this is so irrespective of whether the conveyance or transfer was made before, and in anticipation of the wife's suit for maintenance or alimony, or pending the suit, or after a decree has been made in the wife's favor. Crowder v. Crowder (1919), 125 Va. 80, 99 S. E. 746; De Ruiter v. De Ruiter (1901), 28 Ind. App. 9, 62 N. E. 100, 91 Am. St. Rep. 107; Buffalo v. Letson (1912) 33 Okla. 261, 124 P. 968; Walker v. Walker (1905), 127 Iowa 77, 102 N. W. 435; Sneed v. Sneed (1927), 172 Ark. 1135, 291 S. W. 999, 1000; Wood v. Wood (1928), 166 Ga. 519, 143 S. E. 770. See also Annotation 79 A. L. R. 421, and cases cited.

In discussing the right of the wife, as respects her claim for alimony or maintenance, to invoke the protection of the statute avoiding conveyances or transfers made in fraud of creditors the text writer in 17 Am. Jur., p. 505, Divorce and Separation, says: ''It is generally recognized that a decree for alimony in favor of his wife cannot be defeated by a fraudlent conveyance of his property on the part of the husband, for such an alienation could be set aside under the usual statutory provision declaring null and void all conveyances made with the intention of hindering and delaying creditors and others of their just and lawful demands. The same is equally true even in the absence of statute, since the matter is then controlled by the Act of 13 Elizabeth, chapter 5, of which most modern statutes are a mere reenactment. And, provided its fraudlent character is established, a conveyance may be set aside, whether made after the rendition of the award, during the pendency of the litigation wherein it is sought, or prior thereto, and in anticipation thereof.''

The complainant's bill in Cause No. 4403 alleged that the purported deeds had been executed by the

defendant, Thomas H. Blount, to his father with the deliberate design of placing the title to the property beyond the ordinary process of the court, and for the purpose of defrauding and withholding from the complainant and the two minor children their property rights under the law; and that the transfer of the title to the lands had been effected pursuant to a conspiracy by and between the said Thomas H. Blount and his father to perpetrate a fraud upon the complainant and the two minor children. The chancellor found from the evidence that the allegations of the bill of complaint had been sustained, and there is ample evidence in the record to support the chancellor's finding.

The record shows that Tom and his wife separated on May 26, 1954, and that Tom executed deeds to his father two days later. The deeds were filed for record on June 2, the day after the appellee filed her bill for divorce. Each of the deeds recited a consideration of ''$10 and other valuable considerations.''

The appellant H. E. Blount admitted in his answer that he knew at the time of the execution of the deeds that Tom and his wife were separated and living apart. The appellant admitted in his answer that Tom had turned over to him all the cattle and dairy equipment owned by him, and the appellant testified during the hearing of the case on its merits that he went to Meridian with his attorney on May 26, and told the manager of the Borden Milk Company's plant in Meridian that he had bought all of Tom's property and requested the manager to change Tom's milk account to H. E. Blount Account No. 2. The appellant testified that Tom gave him a bill of sale of his 1953 Buick automobile a short time thereafter, and turned over to him his airplane, which the appellant sold for $1,800. The appellant admitted that Tom had deeded the lands to him once before, when he and his family ''were in an uproar.'' The prior deed was later

introduced in evidence, and it was shown that the deed had been filed for record on August 19, 1952, one day after the appellee had filed her first bill for divorce.

Tom testified during the hearing on December 6, 1954 which was about one week after he had been arrested and required to execute the ne exeat bond, that he owned no property at that time. He was asked who prepared the deeds, which were dated May 28, 1954. His answer was that he did not remember but he thought his daddy had them drawn up. He was asked how much he owed his daddy at the time he conveyed his property to him, and his answer was, "I don't have any idea." He was asked when he suddenly decided to convey the property to his daddy. His answer was, "My wife and I had not been getting along too good, and I knew if I didn't pay him what I owed him he would never get it." He was then asked, "And you knew you all were going to separate?" His answer was, "I knew it was possible the way things were going." He was then asked, "That is why you did it?" His answer was, "Yes."

Tom stated that he kept no records of his indebtedness to his father. After considerable prodding concerning the amount of the indebtedness, he stated that he imagined he owed him $30,000 or $40,000. He did not know how many cattle his daddy had let him have. He had bought and sold cattle and paid his daddy for some, he had not paid him for others. He stated that his daddy gave him some cattle the first year after his marriage. He did not give his daddy a note for the cattle - not until thirty or sixty days before he and his wife separated. When asked again how much he owed his daddy when he settled with him, his answer was: "What I had didn't cover it, but he said he would square off even with what I had. He gave me some money besides that." He was asked, "How much did he give you?" His answer was, "$2,000."

Tom admitted that he had given his daddy a deed of trust on his cattle three, four or five weeks before he and his wife separated, because he and his wife were having trouble.

Tom was called to testify again as an adverse witness during the hearing of the divorce case on its merits, and was questioned about the payments that he had made on the $200 per month alimony allowance which the court had ordered him to pay to his wife at the vacation hearing on December 6. He admitted that he had paid his wife only $100 per month on the allowance made to her by the decree entered on December 6. He admitted that he owned a 1953 Buick automobile and an airplane at the time he and his wife separated, and that he had turned both over to his daddy soon after the separation, and that he left with his two children on his trip to Pensacola, Florida and York, Alabama, in a new automobile purchased by his daddy. He stated that the money that he spent on his travels was $2,000 that his daddy let him have in settlement for his property and $500 that he borrowed later from his daddy. He was questioned about the 1955 Roadmaster Buick that he was driving and the new airplane that he was using at the time of the hearing on the case on its merits, and he stated that the automobile belonged to his daddy and the new airplane, which cost $8,250, belonged to his mother.

The appellee, Mrs. Billie Ruth Blount, testified that H. E. Blount made the statement to her in July 1954 (after Tom had conveyed his property to his daddy and had left the state) that the courts were unfair, "that it was just a matter of who could outsmart the other one," and that so far they had "outsmarted" her. H. E. Blount was asked if he did not make that statement to Mrs. Billie Ruth Blount, and his answer was, "I don't remember saying that."

It seems clear from the testimony of Tom and his father that it was Tom's purpose, after he and his wife

separated, to divest himself of title to all property that he owned, in order that there might be nothing left that could be subjected to the payment of alimony; and there is ample evidence in the record to support the chancellor's finding that H. E. Blount was an active participant in the accomplishment of that design.

It is argued, however, by the appellant's attorneys that the law is well settled in Mississippi that a debtor, though insolvent, has a right to protect one or more of his creditors by conveying his property to such creditors, even though by so doing his other creditors are defeated of their rights, and even though the conveyance is made on account of pendency of suits by other creditors against him, the only condition being that there must be existing between them a valid indebtedness equal to the fair market value of the property conveyed; and the appellant's attorneys say in their brief, in support of their argument, that "this appellant itemized a total consideration from this appellant to the appellant, Thomas H. Blount, of $54,798 in round figures," which "is much more than any value given to the property by even the meager testimony of value in the record."

We do not doubt the proposition maintained on the appellant's behalf that a debtor in failing circumstances may prefer one creditor to another, even though the creditor be his father, and that he may convey or encumber his property to secure a bona fide debt, even though the effect of the conveyance or encumbrance is to deprive other creditors, equally meritorious, of the opportunity to obtain security for their claims. But the proposition, we think, falls to the ground in the present case, for want of clear and convincing evidence of a bona fide preexisting debt in excess of the value of the property conveyed.

The appellant H. E. Blount averred in his answer that Tom's indebtedness to him was "in excess of $21,000."

The appellant testified during the hearing six months later that Tom owed him more than twice that amount. But the appellant produced no original books of account to sustain such claim, and only written acknowledgment of an indebtedness offered in evidence was the chattel deed of trust on cattle which was dated February 5, 1954, and which was filed for record on June 7, 1954, two weeks after the divorce suit was filed, and which purported to secure a promissory note for the sum of $18,208.

The appellant testified that when Tom went into the dairy business in 1949 and 1950 he let him have 49 head of cattle which he valued at $8,980, and that he let him have 34 head of cattle in 1953, which were valued at $6,-177, and that he let Tom have 29 head of cattle in 1953 "along as he needed them", which were valued at $3,108. He stated that Tom had never paid him for the cattle, and that Tom had executed the deed of trust referred to above to secure the payment of the purchase price of the cattle. The appellant admitted, however, that he had kept no record of his cattle sales to individuals. The appellant denied that he had stated in the presence of Mrs. Billie Ruth Blount and Tom that he had given Tom the first cattle that he had put on the place, as testified by Mrs. Billie Ruth Blount during her examination in chief.

The appellant testified that Tom owed him $2,000 for bulldozer work which he had done for Odell Barrier in 1951, about the time Tom purchased the Odell Barrier place, and for which Tom was allowed credit on the purchase price of the land. He stated that Tom owed him $150 for work done on the place after he had purchased it. He stated that Tom owed him $1,002 for bulldozer work done on the dairy farm in 1953, which consisted of clearing "maybe 80 hours of clearing", making a ditch, pulling a grader, and making a water and fish pond; that Tom owed him milk bills, for milk delivered to Tom and his wife for family use, between November 1947 and May

1954, which amounted to $1,369 - "He never paid the first penny on it since he has been keeping house." He stated that he furnished Tom "the money, equipment, mules, feed, seed, transportation and most of the labor", to make a crop on the Odell Barrier place in 1953, and that Tom owed him $3,480 for that. He stated that Tom owed him $3,540 for labor furnished by him during the years 1950, 1951, 1952 and 1953. He stated that part of the labor was furnished to build a barn, and then he said: "I had to send in a man to keep his fences up, and when he was short of milking I would send a man in there, and I furnished a man to run the tractor. He never did have a tractor man." He was asked where the labor came from. His answer was: "They came off my place. I always kept extra labor around." He stated that Tom owed him for 2,000 fence posts, which were reasonably worth 18 cents each; that Tom owed him $357 for 42 spools of barbed wire, which he had let him have during the period from 1950 to 1954; and that Tom owed him $900 for rent for the years 1951, 1952 and 1953, on 50 acres of pasture land on which Tom had pastured cattle. He stated that Tom owed him $6,400 as unpaid balances on feed accounts for 1950, 1951, 1952 and 1953. He stated that he had let Tom have $1,395 in money in 1953, which had not been repaid. He started that he had hauled Tom's milk for him to the milk plants at Meridian, along with his own milk, during the years 1952, 1953 and 1954, and that he had never been paid for that service; and that the fair market value of that service was 50 cents per hundred weight, which amounted to $4,078.

The appellant was asked what Tom did about feeding his cattle. His answer was: "Well he paid for over half of his feed, and I just had a charge account, and at the end of each year I posted it up, and I have been letting that ride." The appellant was asked if he kept any record of the labor he furnished Tom. He said that he

did keep a record. He was asked, "Where are your books on that?" His answer was: "I run his account in this book, and there is about two-thirds of the book left. It has been thrown around for three or four years, and he never did pay nothing, and it got torn up." He was asked whether he kept any record of the amount he advanced for farming operations on the Barrier place. His answer was that it was in the same book. He was asked if he had his cancelled checks showing such advancements. He said he did not have any such cancelled checks with him; he might be able to find part of the checks; but "largely speaking" he used money; he paid all his labor with money. He said he had the posts charged to Tom, but he did not know what went with the little book.

The appellant was asked what was said when Tom executed the deeds of conveyance to him after he and his wife had separated. His answer was, that Tom came to him and said that he owed more than he felt like he could ever pay, "and I made the proposition to give him the $2,500 and take hold." He stated that he was to assume the responsibility for paying what Tom owed. He stated that he had operated both of the places since Tom deeded the property to him, and had paid $5,135.68 on a note which Tom owed to the Newton County Bank and a $2,350 debt on the Stillo place.

The appellant offered in evidence three cancelled checks payable to cattlemen in Illinois and aggregating the sum of $6,177.50, which he had issued in July and August 1953 for the purchase price of 34 head of cattle, and also five cancelled checks for the total sum of $1,395, which he had issued to Tom during the year 1953. But he produced no books of account showing details as to the items and amounts of the indebtedness which he claimed that Tom owed him, other than a statement of Tom's monthly milk bills covering the 6½-year period mentioned above, and when questioned about the milk bills he admitted that he had never sent Tom a milk bill

for milk delivered to him for family use during the entire
6½ years.

The appellant was asked by the court what book of
original entry he had pertaining to Tom's feed account.
His answer was, "This little book has about two-thirds
of it out. Like I said, the accounts run several years, and
there is only about one-third of the book left." He stated
that he had run up the account after the separation and
put it on a tablet. He was asked where the tablet was,
and his answer was, "It might be over at the house."

The court then asked the appellant the following addi-
tional questions concerning other major items of Tom's
alleged indebtedness and received the following answers:

"Q. This labor work, what did you put that down in
that you charged? What kind of book did you
put it in?

"A. This little old book, I believe it was in this one.
There is about two-thirds of this one gone.

"Q. Then you had him charged with some bulldozer
work. What kind of book did you put that in?

"A. It was in there.

"Q. You had him charged with furnish in 1953 on the
Stillo place. What kind of book did you put that
in?

"A. If it wasn't in this book, it was one similar.

"Q. Then you had bulldozer work that you state
amounted to $2,000.00 that you did for somebody
else as a down payment on the Stillo place. What
sort of book do you have a record of that trans-
action in?

"A. I had it down in here.

"Q. In that same book?

"A. I believe it was.

"Q. Then you presented certain checks for $6,177.50
that you gave to some people in Illinois in pay-

ment of cattle. What sort of book did you charge your son with those cattle in?

"A. I just got all them cows.

"Q. You made no entry of that in any book whatever?

"A. No, sir, I had more than I could do."

The appellee's attorney, during his cross-examination of the appellant, had the appellant identify, and then offered in evidence, a cancelled check for $3,000 dated November 20, 1948, and a cancelled check for $2,000 dated August 2, 1950, which had been issued by Tom to his father in payment for cattle, and also other checks for the total sum of $9,875.73 issued by Tom to his father between September 21, 1950, and June 11, 1951, in payment for cattle.

Edward Brantley, H. E. Blount's milk deliveryman, was called to testify concerning the milk deliveries made by H. E. Blount's dairy to Tom's family from November 1947 to May 1954; and in answer to questions propounded to him on cross-examination by the appellee's attorney Brantley stated that he had never presented milk bills to Tom or his wife for the reason that Mr. Blount had instructed him to give Tom's milk bills to him at the end of each month.

Most of the testimony concerning the alleged indebtedness which Tom owed his father came from the appellants. But the appellee, Mrs. Billie Ruth Blount, during her examination in chief was asked about the cattle that Tom had when he went into the dairy business; and in answer to questions propounded to her stated that she had heard Tom and his father say that 44 head of cattle which Mr. Blount had turned over to Tom about that time were a gift to Tom by his father, that Mr. Blount had not sent Tom to college, and he wanted to give him a start. The appellee was later recalled to testify in rebuttal, and at that time identified and offered in evidence a large number of cancelled checks which had been

issued by Tom to his father during the five-year period from 1949 to 1954 in payment for cattle feed, and also cancelled checks aggregating the sum of approximately $13,500 which had been issued by Tom to his father for purposes not shown on the checks.

"The burden to show that a conveyance was made for a valuable consideration other than that set forth in the deed lies on the grantee, and, where the deed recites merely a nominal consideration, the burden of showing that he gave a fair consideration is on the defendant." 37 C. J. S., 1125, Fraudulent Conveyances, par. 388.

According to the testimony of the appellant, H. E. Blount, the total amount of Tom's indebtedness to him exceeded the sum of $43,000 at the time the deeds were executed. Yet, as we have already stated, the only written acknowledgment of such indebtedness offered in evidence in support of the appellant's claim was the chattel deed of trust on the cattle, for the sum of $18,208, which was filed for record after the divorce suit was filed; and, neither the appellant, H. E. Blount, nor Tom produced in court any books of original entry or itemized statements of account to show that Tom's indebtedness to his father at the time the deeds were executed amounted to $43,000.

The rule is well settled that, in a case of this kind, where it is claimed that a conveyance was made to satisfy or secure an antecedent indebtedness, there must be clear and convincing proof of the existence of a valid debt, including disclosure of details as to the items and amount of the debt, and it must clearly appear that the conveyance was in fact made in consideration of such debt. The necessity of clear and satisfactory proof of indebtedness particularly exists in the case of conveyances to near relatives, as in the case of conveyances between husband and wife, or between parent and child.

37 C. J. S., 1265, Fraudulent Conveyances, par. 421 b; and cases cited.

Where an immediate member of a family is preferred as a creditor there must be clear and satisfactory proof of a valid and subsisting debt which would be enforced and payment exacted regardless of the fortune or misfortune of the debtor. Bartel v. Zimmerman, 293 Ill. 154, 127 N. E. 373; Dillman v. Nadelhoffer, 162 Ill. 625, 45 N. E. 680; Fleischner v. Bank of McMinnville, 36 Or. 553, 60 P. 603; see also Higham v. Vanosdal et al., 125 Ind. 74, 25 N. E. 140; Bomar v. Means et al., 53 S. C. 232, 31 S. E. 234.

In Higham v. Vanosdal, et al., supra, the Court held that, where a father furnished money with which to purchase land in the name of his son without any contemporaneous understanding or agreement concerning repayment of the purchase money, the son did not thereby become the father's debtor, since the presumption is that the payment was an advancement. In its opinion in that case the Court said: "It is not necessary that there should have been an agreement between the father and the son in order to constitute money paid by the former, for the benefit of the latter, an advancement; but in order that money so paid should constitute a debt, the contemporaneous facts and circumstances must make it appear that it was understood and intended at the time to be a debt."

From a reading of the record in this case it seems clear that several of the major items of alleged indebtedness which the appellant undertook to establish as preexisting debts were not in fact items of indebtedness for which the appellant expected to exact payment at the time the transactions took place. It does not appear from the record that the appellant ever made any charge against Tom on any books or account, or took any note from Tom, for the 49 head of cattle which he purchased for

Tom in 1949 or 1950, until a short time before the divorce suit was filed, and the chancellor had a right to conclude from the evidence that the 49 head of cattle were intended as a gift or an advancement by the father to the son. If the transaction constituted a gift or an advancement at the time the cattle were turned over to Tom, it could not be converted into a debt four or five years later so as to constitute a consideration as against the appellee for the conveyance executed by Tom to his father after Tom and his wife separated. Higham v. Vanosdal et al., supra; Bomar v. Means, et al., supra.

The appellant's claim for $3,540 for labor alleged to have been furnished to Tom from time to time over a period of four years, and the claim for $1,002 for the use of the appellant's bulldozer and other equipment in clearing land, making a ditch and "building a water and fish pond," were neither itemized nor supported by any contemporaneous records or other documentary evidence; and so far as the record shows no demand was ever made upon Tom for payment of either of the claims. The appellant's claim that Tom owed him $4,078 for hauling milk to Meridian was another lump sum claim for services rendered over a period of years for which no charges appear to have been entered on any books of account. The appellant had hauled Tom's milk to Meridian, along with his own milk and in the same truck, for a period of three years, and the fact that no payment had been exacted for such services and no charge had been made therefor is a strong indication that no payment was expected. As to the appellant's claim for $1369 for milk delivered to Tom and his wife for family use during the 6½ years of their married life, the appellant admitted that he had never sent Tom a milk bill during the entire 6½ years. The appellant produced no itemized statements of account or cancelled checks to show that he had furnished Tom money, labor and supplies, in the amount of $3,480, to make a crop on the Barrier place during the year 1953;

and there is no clear and convincing evidence in the record to show that Tom owed the appellant $6,400 for unpaid balances on feed accounts covering a period of four years.

It seems incredible that a businessman should make advancements of money and other financial assistance over a period of years, even to a member of his own family, to the amount of $43,000, for which he expected to demand payment at a later date, and yet preserve no contemporaneous records, memoranda, or books of account, to show the dates or amounts of such advancements. The lack of such records in this case is sufficient in itself to cast doubt and suspicion upon the claims put forward by the appellant in his effort to show a preexisting indebtedness equal to or in excess of the value of the property conveyed to him; and the fact that the appellant had failed to preserve and was unable to produce any contemporaneous records or books of account to support his claim that Tom owed him the several amounts mentioned above is a circumstance in itself which strongly indicates that the appellant did not intend that the assistance rendered in each such instance should constitute a debt for which payment would be exacted.

After considering all the evidence in the case the chancellor had a right to conclude, and doubtless did conclude that the financial assistance rendered by the appellant to Tom over a period of several years, for which no records were kept, was not intended to be treated as a debt at the time such assistance was rendered, and that the purpose to treat the same as a debt was not formed until the prospect of a decree for alimony in favor of the appellee was imminent.

■■■ The burden of proof in this case was on the appellant to show by clear and satisfactory evidence not only a bona fide indebtedness, which was intended to be enforced, but also that the amount thereof was not ma-

terially less than the fair and reasonable value of the property conveyed to him; and the appellant failed to make such proof.

We think there is no merit in the appellants' contention that the chancellor erred in setting aside the deeds of conveyance of the lands without a specific finding that the value of the property conveyed was substantially in excess of the indebtedness. No request was made for such specific finding, and although the evidence in the record concerning the fair market value of the property conveyed, is by no means as definite as it should be, it is clear that the value of the property conveyed was substantially in excess of any preexisting indebtedness shown to be due. The chancellor on consideration of the whole evidence found that the allegations of the bill of complaint had been sustained and that the deeds should be cancelled. The chancellor therefore had a right to enter a decree of cancellation.

■■ A general finding that the complainant is entitled to the relief sought will support a decree for the relief prayed for. 37 C. J. S., 1286, Fraudulent Conveyances, par. 439.

■■ It is next argued that, even though the chancellor had a right to set aside the conveyances on the ground that the value of the property conveyed was substantially in excess of any preexisting indebtedness shown to be due and owing to the appellant, the court erred in failing to decree a lien against the property in favor of the appellant for the amount of the indebtedness actually shown to be due; and the appellants' attorney cites in support of their contention on this point the case of Holman v. Hudson, 188 Miss. 87, 193 So. 628, and Mississippi Cottonseed Products Co. v. Phelps, 196 Miss. 252, 16 So. 2d 854.

In the Holman case the Court held that a voluntary conveyance which leaves the grantor without property to

which his creditors may resort is void as to the creditors; but a conveyance in good faith, for a valuable though inadequate consideration will be sustained to the extent of the consideration, and will be given the effect of a mortgage to secure the payment thereof. The rule thus stated was reaffirmed in the Mississippi Cottonseed Products Company case.

But the rule announced in the Holman case and reaffirmed in the Mississippi Cottonseed Products Company case has no application to the facts in this case. In the Holman case the Court found that no actual fraud on the part of the grantee had been proved, and the Court merely recognized the equitable doctrine, which is well established, that, when a conveyance is fraudulently made upon a consideration, which is valuable, but substantially inadequate, and the grantee is without notice of the grantor's intent, and himself intends no fraud, the conveyance is not wholly void, but will be allowed to stand as security for the value actually paid.

However, it is only in cases where the grantee in a fraudulent conveyance or transfer is not guilty of actual fraud, but is chargeable with knowledge of such facts that the law holds him guilty of constructive fraud, that the grantee is entitled to protection to the extent of the consideration paid by him, or that the court may allow the conveyance to stand as security for the reimbursement of the grantee.

 In this case the finding of the chancellor was a finding of actual fraud on the part of the grantee as well as the grantor. Where the conveyance is founded in actual fraud the grantee is regarded as a particeps criminis, and is not entitled to reimbursement, or to have the conveyance stand for any purpose of reimbursement or indemnity, for the consideration paid. 37 C. J. S., 1118, Fraudulent Conveyances, par. 280 b.

In the annotation which appears in 79 A. L. R., pp. 132, 133, the rule relating to the right of the grantee in a

fraudulent conveyance, who is shown to have been guilty of participation in the fraud, is stated as follows:

"it is generally held that a grantee, mortgage, or transferee in an instrument executed in fraud of creditors, who is clearly shown to be guilty of participation in the fraud of the grantor, mortgagor, or transferrer, is not entitled, as against creditors of the latter, on the setting aside of the conveyance or transfer, to protection to the extent of the consideration paid by him." See also cases cited.

In Lynch v. Burt (C. C. App. 8th Ct.), 132 Fed. 417, the Court held that a grantee in a fraudulent conveyance, who was a conscious participant in the fraud, on the setting aside of the conveyance was not entitled to recover expenditures made to protect his title. The Court in its opinion in that case said: "If the grantee has been a conscious participant in the fraud, he is not, as against creditors, entitled to reimbursement for such expenditures. Burt v. Gotzian & Co., 43 C. C. A. 59, 69, 102 Fed. 937; Guckenheimer v. Angevine, 81 N. Y. 394. Public policy forbids the reimbursement of a particeps criminis; otherwise one would hazard nothing by active participation in such unfair dealing. But if the grantee has not been a conscious participant in the fraud, he is entitled to reimbursement to be provided for in the decree. Clements v. Moore, 6 Wall. 299, 312, 18 L. Ed. 786; Voorheis v. Blanton, 32 C. C. A. 384, 89 Fed. 885; Boyd v. Dunlap, 1 Johns. Ch. 478; Milholland v. Tiffany, 64 Md. 455, 2 Atl. 831; Daisy Roller Mills v. Ward, 6 N. D. 317, 324, 70 N. W. 271."

In Campbell v. Davis, 85 Ala. 56, 4 So. 140, it was held that where an embarrassed debtor conveyed land by deed absolute, but intended only as a mortgage to secure a debt, the conveyance was fraudulent in law as against the grantor's existing creditors, and the grantee, participating in the fraud, was not entitled to have the conveyance

stand as security for the actual indebtedness. In Waddle v. Great Southern Phosphate Co., 184 Ala. 346, 63 So. 462, it appeared that an insolvent had conveyed practially his entire estate to his wife in satisfaction of an antecedent debt. The court found that the conveyance was made to hinder, delay, and defraud the husband's creditors, which was known to the wife, and that the value of the property conveyed greatly exceeded the amount of the debt. It was held that the grantee was not entitled to have the conveyance stand as security for the debt. In Sommermeyer v. Schwartz (1894), 89 Wis. 66, 61 N. W. 311, it was held that, where one about to become a partner in a mercantile business conveyed all his property worth several thousand dollars, to his wife in payment of a loan of $400, the conveyance was fraudulent as against subsequent creditors of the partnership, and would not be upheld even as security for the actual bona fide debt. In Wolbrecht v. French et al., 24 Cal. App. 505, 141 P. 942, the Court held that where a wife, at the time of a conveyance to her by her husband, knew that his intent was to hinder and delay plaintiff, a creditor, and participated with him in carrying out the fraud, the Court, in setting aside the conveyance, erred in giving her a lien for any amount of money in preference to plaintiff's claim.

In McLean v. Letchford, 60 Miss. 169, the Court held that where a man, in pursuance of a scheme to defraud unsecured creditors, purchased the debtor's lands under a deed of trust, and, afterwards, the creditors had the fraudulent conveyance set aside, the grantee therein was not entitled to reimbursement for the money paid out in his purchase at the sale under the deed of trust, notwithstanding the deed of trust was a valid encumbrance upon the land.

If the chancellor had found that the conveyances in the case that we have here had been made to the appellant, H. E. Blount, in good faith and for a valuable though in-

adequate consideration, and that no actual fraud on the part of the grantee had been proved, as in the Holman case, supra, the appellant would have been entitled to protection to the extent of the indebtedness actually due and owing to him. But since the chancellor found that the appellant actively participated in the fraud, the appellant was not, as against the appellee, entitled to claim the rights of a preferred creditor, or to reimbursement for the money paid out after he acquired title to the lands.

 Finally, it is argued on behalf of the appellant, H. E. Blount, that the chancellor erred in going beyond the scope of the pleadings and setting aside the conveyance of the personal property. The appellant's attorneys say that the bill in Cause No. 4403 did not charge fraud in the transfer of the personal property, that there was no specific prayer in the bill to set aside the conveyance of the personal property, and that the chancellor had no right to do so.

But we think there is no merit in this contention.

The suit for divorce and alimony and the two suits involving the conveyance of the lands and the transfer of the personal property from Tom to his father were companion cases and were tried together by agreement of the parties. The relief prayed for in Cause No. 4403 was ancillary to the appellee's claim for alimony and support for the two minor children. The prayer of the bill in Cause No. 4403 was not only a prayer for the specific relief mentioned in the bill, but also a prayer for ''such other, further and general relief'' as in equity the appellee might be entitled to. Under the prayer for general relief the court had a right to grant any appropriate relief conformable to the case made by the pleadings and the proof.

The appellant averred in his answer in Cause No. 4403 that Tom had delivered the personal property to him at

the same time he executed the two deeds, and that the personal property and the deeds were to repay him for the indebtedness that Tom owed him, which exceeded the value of Tom's equity in all the property, both real and personal. The appellant's defense to the suit throughout the trial was that Tom had a right to convey all the property to him as a preferred creditor in consideration of Tom's alleged preexisting indebtedness to him, even though by doing so the appellee would be defeated of her right to alimony. The appellant's proof showed that the conveyance of the lands and the transfer of the personal property were in effect parts of the same transaction. The chancellor after hearing the testimony found that the conveyances were fraudulent and ordered that they be set aside. The transfer of the personal property was effected with the same fraudulent intent as the execution of the deeds. Both were designed to place the property beyond the reach of the appellee's claim for alimony, and the chancellor had a right to set aside the transfer of the personal property as well as the deeds. The relief granted came within the appellee's prayer for general relief, and conformed to the case made by the proof.

The first point argued by the appellant, Thomas H. Blount, as ground for reversal of the decree is that the amount of the alimony and support money awarded to the appellee was excessive. But we think that the award of alimony in the sum of $275 per month for the support and the maintenance of the appellee and the two minor children, under the facts in this case, was not excessive.

In Gresham v. Gresham, 198 Miss. 43, 21 So. 2d 414, this Court said: "It is the general rule in this state that the matter of awarding alimony, both temporary and permanent, is largely within the discretion of the trial court 'and is not subject to revision and correction on appeal, unless it is erroneous on its face, or unjust to either par-

ty, or oppressive.' Winkler v. Winkler, 104 Miss. 1, 61 So. 1, 2, Ann. Cas. 1915C 1250.''

The chancellor found that the appellant, Thomas H. Blount, was a strong able-bodied man with a good earning capacity, and the owner of the property mentioned in the decree, and that he was amply able to provide for the support and maintenance of the appellee and the two minor children. We think that it cannot be said that the amount of alimony allowed was unjust or oppressive or that the chancellor abused his discretion in making the award.

■■ ■ It is next argued on behalf of the appellant, Thomas H. Blount, that the court erred in continuing in full force and effect the ne exat bond, which the appellant was required to execute after his return from his travels. But we think the chancellor had a right under the facts in this case to continue in force the ne exeat bond.

''A writ of ne exeat is not a mere provisional remedy in the sense that it can be issued only pending a suit, and must expire on the rendition of judgment. Its issuance may be provided for in the final decree, and will continue in force until dissolved by the court, or the judgment is satisfied, or proper security is given.'' 38 Am. Jur. 619, Ne Exeat, par. 2.

Section 2743, Code of 1942, provides that, when a divorce shall be decreed and alimony allowed to the wife, the court may, if need be, require sureties for the payment of the sum so allowed.

In Edmondson v. Ramsey, 122 Miss. 450, 84 So. 455, the Court held that the chancery court has inherent power, where in its judgment it is deemed necessary for the enforcement of its orders, to remand a defendant to the custody of the sheriff until he has executed the bond required of him by decree of the court. The Court in its opinion in that case said: ''It is also to be borne in mind that our chancery courts have power to issue the equitable

writ of ne exeat republica even before an award of alimony, when a proper charge is made to the court that the defendant is about to leave the state or that he has said that such was his purpose. Under this proceeding, he may be required to execute a bond with sufficient sureties conditioned not to leave the state, or as security for the payment of the alimony which may be adjudged against him. 1 R. C. L., 888; Bronk v. State, 43 Fla. 461, 31 So. 248, 99 Am. St. Rep. 119.''

We think that the chancellor had a right to continue in force the ne exeat bond, if in his opinion such action was necessary to insure a good faith compliance with the terms of the alimony decree. The appellant may at any time file an application for a modification of the terms of the decree relating to the continuation in effect of the bond, and upon the hearing of such application the court may make such order with reference thereto as may be just and proper.

We find no reversible error in the record and the decree of the lower court is therefore affirmed.

Affirmed.

*Roberds, P. J.,* and *Hall, Holmes* and *Gillespie, JJ.,* concur.

## ON MOTION OF APPELLEE'S ATTORNEYS FOR ALLOWANCE OF SOLICITORS' FEE

This case was before us during the March 1957 Term of this Court on appeal by Thomas Hardy Blount from a decree of the Chancery Court of Neshoba County rendered in favor of Mrs. Billie Ruth Blount in a suit for a divorce and alimony. The decree of the lower court was affirmed by us on June 3, 1957.

The appellee's attorneys have filed a motion for the allowance of an additional solicitor's fee for legal services rendered by them on behalf of the appellee on said appeal. The motion has been filed by the attorneys in their

own names and on their own behalf, and not in the name of the appellee.

■■ This Court has held that an application for the allowance of attorney's fee for legal services rendered on behalf of the wife in a divorce suit must be made in the name and on behalf of the wife, and that if such allowance is made it should be made to the wife. Parker v. Parker, 71 Miss. 164, 14 So. 459. An award made to the wife for the payment of attorney's fees is made to her and not made directly to the attorneys who represent her. Rees v. Rees, 188 Miss. 256, 193 So. 334.

■■ The motion filed by the appellee's attorneys for the allowance of an additional attorneys' fee is therefore dismissed, without prejudice to the appellee's right to file a proper motion for the allowance of such attorneys' fee within fifteen days from this date, if she desires to file such motion.

All Justices concur, except McGehee, C. J., who took no part.

ON MOTION FOR ALLOWANCE OF ATTORNEYS' FEE

October 7, 1957 97 So. 2d 240

KYLE, J.

This case was before us during the March 1957 Term of the Court on appeal by Thomas Hardy Blount from a decree rendered by the Chancery Court of Neshoba County in favor of Mrs. Billie Ruth Blount for divorce and alimony. The decree of the lower court was affirmed by us on June 3, 1957, 95 So. 2d 545. The appellants' suggestion of error was overruled on July 3, 1957. While the suggestion of error was pending the appellee's attorneys filed in their own names and in their own behalf a motion for the allowance of an additional solicitors' fee for legal services rendered by them on behalf of the appellee on said appeal. Upon consideration of the motion this

Court held that an application for the allowance of attorneys' fee for legal services rendered on behalf of the wife in a divorce suit must be made in the name of and on behalf of the wife, and that if such allowance is made it must be made to the wife, and the motion filed by the appellee's attorneys for the allowance of additional attorneys' fee was therefore dismissed, without prejudice to the appellee's right to file a proper motion in her own behalf within fifteen days if she desired to file such motion. See 96 So. 2d 232.

The appellee has filed such motion in her own name and in her own behalf within the time allowed, and the motion is hereby sustained; and it appearing that the sum allowed by the lower court to the wife as a reasonable attorneys' fee for legal services rendered in that court was $750, and that an additional fee should be allowed for the payment of her attorneys for legal services rendered on the appeal to this Court, an additional sum of $375 will be allowed for such services, said amount to be paid to the appellee by the appellant, Thomas H. Blount, within sixty days from the date of the filing of a copy of the order of allowance with the clerk of the lower court.

Motion sustained.

*Roberds, P. J.,* and *Hall, Holmes* and *Gillespie, JJ.,* concur.