# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00476-COA

LENNIE W. DINGLER AND LESIA C.L.               APPELLANTS
DINGLER

v.

MARTHA PATRICIA FERGUSON                         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/2013 |
| TRIAL JUDGE: | HON. TALMADGE D. LITTLEJOHN |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | PHILLIP M. WHITEHEAD |
| ATTORNEY FOR APPELLEE: | JAK MCGEE SMITH |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | DENIED THE APPELLANTS' MOTION TO DISMISS; ORDERED THE APPELLANTS TO CONVEY CERTAIN REAL PROPERTY TO THE APPELLEE'S EX-HUSBAND, WHO IN TURN WAS ORDERED TO CONVEY THE REAL PROPERTY TO THE APPELLEE AS PART OF THE EQUITABLE DISTRIBUTION OF THEIR MARITAL ASSETS |
| DISPOSITION: | AFFIRMED - 11/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., MAXWELL AND JAMES, JJ.**

**MAXWELL, J., FOR THE COURT:**

¶1.     According to Lennie and Lesia Dingler, Kevin Ferguson voluntarily walked away

from a contract to lease / purchase their convenience store, after paying more than one-third

of the $150,000 purchase price.  As a result, the Dinglers evicted Kevin's estranged wife,

Martha Patricia Ferguson ("Pattie"), who had been operating the store and living in the back of the property.

¶2.    Pattie sued the Dinglers as part of her divorce action against Kevin.  In response, the Dinglers claimed Pattie lacked standing to sue them because her name was not on the lease.  But Pattie did not sue them for breach of contract.  She sued them for conspiring with Kevin to interfere with her rights to marital property.  When the Dinglers forced Pattie out, they were not enforcing any contractual right to self-help.  Rather, Kevin still had the right to possess the store under the lease / purchase agreement.  And the chancellor found, contrary to the Dinglers' assertions, Kevin never in fact voluntarily relinquished this right.  Rather, both the Dinglers and Kevin acted like the lease was still in effect.  The only difference was that Kevin's dad, not Pattie, was running the store and living on the premises.  On appeal, we will not disturb this finding, as it was supported by substantial evidence.  Because the lease retained by Kevin was a marital asset, subject to equitable distribution, we find Pattie had a legally protected interest in it.  So she had the necessary standing to sue the Dinglers for their interference.

¶3.    During the pendency of Pattie's lawsuit, all Kevin's obligations under the lease / purchase agreement were fulfilled—including paying the full purchase price, plus interest.  Because the agreement required the Dinglers to convey the property to Kevin upon receipt of the purchase price, we affirm the final divorce judgment, which ordered the Dinglers to convey the property to Kevin, and for him to then convey the property to Pattie as part of the equitable distribution of their marital property.

**Background Facts and Procedural History**

### I.     Lease / Purchase Agreement

¶4.     Lennie and Lesia Dingler owned a convenience store on Highway 25 in Tishomingo, Mississippi, called "Lesia's One Stop." Ready to retire, they found a buyer, Kevin Ferguson, whom they agreed to finance.

¶5.     On July 23, 2009, the Dinglers and Kevin entered into a lease / purchase agreement. Under this agreement, Kevin would lease the store's real property and other assets until he had paid the $150,000 purchase price in full. Kevin paid the Dinglers $5,000 upon signing. He then paid another $5,000 in September and $40,000 in October—for a total of $50,000 in cash. The remaining $100,000 (plus 8% interest) was to be paid in monthly installments of $2,485.40. These monthly payments would start in November 2009 and continue for forty-seven months until October 2013.

¶6.     Per the agreement, any failure to pay the monthly rent within ten days of its due date would lead to default. Upon default, the Dinglers had the option to terminate the lease and retake the property. But upon payment in full, the Dinglers must convey the property by warranty deed to Kevin.

### II.     Pattie's One Stop

¶7.     The day after entering the lease / purchase agreement, Kevin set up a limited-liability company with his wife, Pattie. The company's name was Pattie's One Stop, LLC. Its purpose was to operate the convenience store in Tishomingo, which they renamed "Pattie's One Stop." Pattie was to run the store while Kevin worked in Iraq as an independent

contractor.

¶8.    The Dinglers had agreed to train Pattie. From the time the lease began in July 2009 through October 2009, the Dinglers continued to work at the store, showing Pattie how everything was done. During this training period, the Dinglers kept the store's profits. But once Pattie took over in October 2009, she and Kevin got to keep any profit they generated.

¶9.    Pattie not only took over the store in October 2009, she also moved onto the property two months later. Pattie had been living in Alabama with Kevin's father, James Ferguson. James moved his trailer behind the store. And Pattie began converting space in the back of the store into living quarters for her, Kevin, and Kevin's teenaged son. When Kevin returned from Iraq in February 2010, he stayed with Pattie and his son in the back of the store and worked on the construction of the living space.

### III.    Marital Separation and Alleged Lease Termination

¶10.   In February 2010, Kevin and Pattie had been married for almost nine years. But their relationship was on the skids. Both had been involved in extramarital affairs. And Pattie testified Kevin had come home from Iraq "changed." After a few weeks at home, Kevin returned overseas, not wanting to be married anymore.

¶11.   On May 14, 2010, the Dinglers appeared at the store with local law enforcement. They told Pattie that Kevin had terminated the lease / purchase agreement. So they were there to reclaim the store. Earlier that day, James went to the Dinglers and informed them Kevin wanted to surrender the store—and the more than $60,000 he had invested in it. James claimed to have a power of attorney for his son. So the Dinglers and James executed a hand-

4

written termination letter, which the Dinglers presented to Pattie that afternoon. The Dinglers eventually talked to Kevin on the phone. According to them, he confirmed he was tired of losing money through the store.

¶12. While Pattie was forced out of the store and her home that day, her stepson was allowed to stay in the back apartment, and James kept living in his trailer. The Dinglers shut down the store for several days. When friends posted on social media, asking what was going on, Lesia responded that she and Lennie were *not* taking over the store. Rather, they were helping James run the store. Apparently, James had provided $35,000 of the $50,000 down payment, which he would lose if the lease / purchase agreement was terminated early. James later testified he knew Kevin's termination of the lease meant he (James) would lose his $35,000. That is why he hoped to rent the store from the Dinglers.

### IV. Divorce Complaint and Emergency Hearing

¶13. On May 19, 2010—five days after she was kicked out of her store and home—Pattie sued Kevin for a divorce. In addition to Kevin, she named her father-in-law, James, as a defendant. She claimed Kevin and James had conspired with the Dinglers to divest her of her interest in the store, which Pattie claimed was marital property. Pattie amended her complaint two weeks later to add the Dinglers as defendants. Both James and the Dinglers responded with motions to dismiss. They claimed Pattie had not been a signatory to the lease / purchase agreement and, thus, had no standing to enforce any rights under it.

¶14. The chancery court held an emergency hearing a week later on June 8. While James and the Dinglers appeared at this hearing, Kevin did not. With Kevin still working in Iraq,

5

Pattie had not been able to serve him with process.

¶15. At this hearing, Pattie admitted she had not signed the lease / purchase agreement. But she explained how Kevin had bought the store for her, to give her something to do while he was away, and how the two had created an LLC to operate the store. Pattie also described how the store was not only a marital business but also their marital home. On cross-examination, Pattie was asked if she knew modifying the store to build an apartment was a violation of the lease.[1] Pattie responded that the Dinglers knew about the living space and did not mind. In fact, Lennie even helped them with one of the construction projects.

¶16. Lennie confirmed that neither he nor his wife voiced any concern over the apartment or any other activity that might have been construed as a default.[2] On May 14, 2010, Kevin was current on all his lease payments. And the Dinglers had no intention to declare a default. Rather, it was *James* who initiated the termination by telling the Dinglers Kevin wanted to surrender possession of the store.

¶17. At the end of this hearing, the chancellor granted Pattie's emergency request to be restored to the marital home. The chancellor found no proof that James had a power of attorney to terminate the lease / purchase agreement. So he ordered the Dinglers to return the store to Pattie, who would be permitted to continue to operate it if she complied with the

---

[1] The lease / purchase agreement forbid any physical modifications to the building without the Dinglers' written preapproval.

[2] The lease / purchase agreement listed "allow[ing] any illegal activity" as a default. And much of the testimony at the emergency hearing centered on whether Pattie allowed gambling and after-hours drinking at the store. (Tishomingo is a "dry" county.) But Lennie testified none of these alleged activities had factored into the decision to terminate the lease.

lease / purchase agreement's terms.

### V. Final Hearing on the Merits

¶18.   Over the next three years, Pattie continued to operate the store and stayed current on monthly payments.  Eventually, she served Kevin with a divorce complaint, when he was back home on vacation.  Because much more than 120 days had passed since filing her original divorce complaint against Kevin,[3] Pattie served him with a new action—an action consolidated with her ongoing case against the Dinglers.[4]

¶19.   In January 2013, Pattie presented her case for divorce based on Kevin's uncondoned adultery.  Kevin did not appear to defend himself.  Because Pattie proved her claim, the chancellor granted her a fault-based divorce.  At the end of the divorce hearing, the Dinglers once again moved to dismiss Pattie's claims against them.  This motion was denied.  And the hearing was continued to July 2013, when all property issues would be resolved.

¶20.   At this final hearing, Lennie testified Pattie was current on all monthly payments through May 2013.  At this point, Pattie tendered a check for the final six payments.  But Lennie refused to cash it.  Despite collecting monthly payments for three years, Lennie insisted the lease had been terminated by Kevin back in May 2010.[5]  Lennie tried to introduce

---

[3] Under Rule 4(h), if the service of the summons and complaint cannot be served on a defendant within 120 days (and no extension or good-cause showing is made), the action will be dismissed against that defendant without prejudice.  M.R.C.P. 4(h).

[4] After consolidation, Pattie filed a third amended complaint.  For reasons unclear from the record, this complaint dropped James as a defendant.

[5] Lennie also testified, without much specificity, that Pattie had violated the lease in other ways since the court ordered she be allowed to return.  But Lennie said he did not exercise his right to terminate the lease because he believed the emergency order prevented

a document purporting to be the power of attorney Kevin had signed over to James back in April 2010. But the chancellor refused to admit the document, finding it had not been properly executed or recorded.

¶21. Lesia testified next. She admitted she had posted on Facebook back in May 2010 that she and Lennie were not taking back the store. Rather, they were helping James run the store. She also admitted that by the time of the final hearing, August 2013, she and Lennie had been paid the entire $150,000 purchase price (plus interest).

¶22. When it was Pattie's turn to testify, she presented a series of emails from Kevin. In them, Kevin kept trying to use the store as leverage, saying she could have it if she would grant him a no-fault divorce.

¶23. From this evidence, the chancellor concluded Kevin had never terminated the lease. Instead, his actions after May 2010 showed he still believed the lease was in effect. The Dinglers too, despite their assertions, never acted like the lease had been terminated. Though they made Pattie leave, they allowed James and his grandson to live on the property. And as they told others, the plan was for James to run the store on Kevin's behalf.

¶24. Because Pattie had finished making all required payments, the chancellor ordered the Dinglers to convey the property to Kevin by warranty deed, in accordance with the lease / purchase agreement. The store was marital property. And after a detailed *Ferguson* analysis,[6] the chancellor awarded the store to Pattie. Kevin was ordered to deed the store to him from doing so.

---

[6] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994) (providing guidelines for chancellors to consider when attempting an equitable distribution of the marital property).

8

Pattie as soon as he received the deed from the Dinglers.

¶25. The chancellor entered a final judgment in March 2014. The Dinglers timely appealed.

**Discussion**

*I.       Pattie's Standing*

¶26. At every stage, the Dinglers have insisted Pattie lacked standing to sue them, as she neither signed nor was a named third-party beneficiary of the agreement. Standing is a question of law, which we review de novo. *Clark Sand Co. v. Kelly*, 60 So. 3d 149, 154 (¶12) (Miss. 2011).

¶27. At first blush, it does seem unusual that Pattie could seemingly drag the Dinglers into her divorce with Kevin, even though she was not a part of the lease / purchase agreement. Among other things, standing required Pattie suffer an "injury in fact"—that is, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 154-55 (¶14) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1991)). According to the Dinglers, Pattie suffered no injury in fact because she had no legally protected interest springing from the lease. But Pattie did not file suit for breach of contract or specific performance. She filed for divorce. And as part of her divorce action, she sued the Dinglers for conspiring with her husband to interfere with her right to possess the marital home and run the marital business.

¶28. While perhaps uncommon, suing third parties as part of a divorce is not unprecedented—especially when the third party claims an interest to a marital asset. *E.g.*,

9

*A & L, Inc. v. Grantham*, 747 So. 2d 832, 837 (¶10) (Miss. 1999) (consolidated case that included, as part of the divorce, the wife's action against her husband's family, to whom the husband had fraudulently transferred corporate assets after he separated from his wife); *Blount v. Blount*, 231 Miss. 398, 405-06, 95 So. 2d 545, 548 (1957) (pre-equitable distribution case where the husband's father had to return property to his son, which had been conveyed in an effort to drain off assets that would otherwise be considered for alimony and child-support purposes). *See also* Deborah H. Bell, *Bell of Mississippi Family Law* § 19.01[2], 463-64 (2005).

¶29. On May 10, 2010—the day the Dinglers tried to remove Pattie from the store—the Dinglers had not declared the lease to be in default. In other words, they made no claim that full ownership and possession of the store reverted to them by operation of the lease / purchase agreement. Instead, on that day, Kevin still had the right to possess the store under the lease.

¶30. This right was clearly a marital asset. *See Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994) ("defin[ing] marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage"). Kevin had entered the lease with the Dinglers during his marriage to Pattie, setting up an LLC with her to run the store. Moreover, Kevin used income accumulated during the marriage to pay the $50,000 down payment and subsequent rent payments. And in December 2010, the store became the couple's marital residence. And as a marital asset, the lease / purchase agreement was subject to equitable distribution. *See id.* ("Assets so acquired or accumulated during the

10

course of the marriage are marital assets and are subject to an equitable distribution by the chancellor.").

¶31.   For this reason, we find Pattie, like the wives in *A & L* and *Blount*, had standing to legally challenge the Dinglers' claim that Kevin, after he left his wife, voluntarily transferred back to them his interest in this marital asset.  Further, this claim was properly consolidated with Pattie's action.  *See A & L*, 747 So. 2d at 837 (¶10); *Blount*, 231 Miss. at 408, 95 So. 2d at 549.

## II.     *The Dinglers' Contractual Rights*

¶32.   The Dinglers also argue the chancellor erred by not allowing the Dinglers to reenter and retake possession of the store in May 2010.  They claim the chancellor—by ordering them to allow Pattie back in and continue to operate the store under the terms of the lease / purchase agreement—improperly interfered with the contract between them and Kevin, essentially invalidating the contract's terms.  Yet the Dinglers fail to point to which contractual terms were ignored.

¶33.   As we emphasized in the previous section, Lennie admitted at the emergency hearing he and Lesia had not exercised their contractual right to self-help.  They had not deemed Kevin to be in default.  And until James approached them the morning of May 10, 2010, they had no plans to terminate the lease / purchase agreement.  So their decision to retake the property that day was not based on the contract's terms.  Instead, it was based on James's representation that Kevin wanted to walk away from the contract—and the more than $60,000 he had paid toward the purchase price.  For this reason, we fail to see how the

11

chancellor improperly interfered with the Dinglers' *contractual* rights.

¶34.    In his emergency order, the chancellor actually affirmed the Dinglers' rights under the lease / purchase agreement.  While ordering Pattie be restored to the property, the chancellor was clear she had to comply with the terms of the lease / purchase agreement—including timely monthly payments and no illegal activity—lest the Dinglers exercise their right to terminate the contract.

¶35.    By the time of the August 2013 final hearing, Lesia admitted she and her husband received the benefit of their bargain.  Pattie had timely paid each $2,485.40 monthly payment in the three years since the emergency hearing.  And she had months earlier tendered a check for the remainder of the purchase price.  Under the terms of the lease / purchase agreement, "[u]pon payment in full of the $150,000 plus accrued interest," the Dinglers were required to convey the store's real property to Kevin by warranty deed and its personal property and fixtures by a bill of sale.  The Dinglers do not argue they were not paid in full.  So we find the chancellor's order that they convey the store to Kevin by warranty deed did no more than hold them to the terms they agreed to.

¶36.    If the chancellor interfered with anything, it was the seeming windfall the Dinglers would have received had the chancellor agreed Kevin terminated the lease / purchase agreement in May 2010.  We recognize the nature of self-financing carries a certain amount of risk and reward.  Had Kevin not been able to keep up with the monthly payments or otherwise been declared in default, the Dinglers would have been entitled under the agreement to keep all payments plus repossess the store.  But, again, Kevin did not default.

Instead, according to the Dinglers, Kevin merely said the Dinglers could keep the $50,000 and the store. And even though the lease would be terminated, the Fergusons (minus Pattie) could continue to pay rent and live and work at the store.

¶37. We find the chancellor's interference was warranted because of the severe negative consequences such a windfall would have had on Pattie. It has been a longstanding principle in Mississippi—even before the adoption of equitable distribution—that one spouse, in anticipation of divorce, cannot convey assets to a third-party to keep them shielded from the other spouse. *See Blount*, 231 Miss. at 411-19, 95 So. 2d at 551-54 (affirming a chancellor's decision to set aside a husband's conveyance of property to his father because the husband's purpose was to divest himself of any assets that would have been subjected to alimony); *see also A & L*, 747 So. 2d at 843 (¶48) ("In a divorce action a chancellor is justified in setting aside, as fraudulent, a conveyance made by one of the spouses, where the conveyance was made with the exclusive intent of cheating the other spouse out of their share of marital assets.").

¶38. In both *Blount* and *A & L*, the husband had conveyed property titled in his name to family members. And in both cases, the chancellor voided the conveyance as a fraudulent attempt to keep assets out of the wife's reach. Here, based on the evidence, the chancellor found no proof Kevin had in fact terminated the lease, so there was no actual conveyance to avoid. But we find the equitable principle from *Blount* and *A & L* still applies. Kevin could not have voluntarily terminated the lease for the purpose of depriving Pattie use of the marital home and cheating her out of her share of the marital business. *See A & L*, 747 So. 2d at 843

13

(¶48).

¶39.    We recognize, in contrast to the relatives in *Blount* and *A & L*, the Dinglers may not have been privy to Kevin's matrimonial motive for relinquishing the store. But still, their advantageous "repossession" of the store would have greatly disadvantaged Pattie. Thus, we find no error in the chancellor's refusal to recognize their alleged gratuitous right to repossess the store.

### III.    *James's Power of Attorney to Terminate Lease*

¶40.    The Dinglers also challenge the chancellor's ruling to exclude the document establishing James's power of attorney for Kevin. While conceding this document was not executed and recorded according to Mississippi law, the Dinglers assert it did not have to be. They insist Kevin had executed a military power of attorney, exempt from state requirements and having equal effect as a  power of attorney executed according to state law.[7] *See* 10 U.S.C. § 1044b (2012).[8]

¶41.    The standard of review for admissibility of evidence is abuse of discretion. *Whitten v. Cox*, 799 So. 2d 1, 13 (¶27) (Miss. 2000). As part of his discretion, the chancellor could

---

[7] Alternatively, the Dinglers argue the power of attorney had to be accepted under Mississippi law—namely, Mississippi Code Annotated section 89-3-5 (Rev. 2011), which validates conveyances, contracts, and instruments that have been acknowledged by commissioned officers in the service of the United States armed forces. But the power of attorney here was signed by a *non*-commissioned officer, so any reliance on section 89-3-5 is misplaced.

[8] Under section 10 U.S.C. § 1044b, "[a] military power of attorney . . . is exempt from any requirement of form, substance, formality, or recording that is provided for powers of attorney under the laws of a State" and "shall be given the same legal effect as a power of attorney prepared and executed in accordance with the laws of the State concerned."

14

not ignore applicable federal law. But here, we note there is some question whether section 1044b actually applied to the document the Dinglers tried to introduce.[9] We need not resolve that question on appeal, however. Even assuming the Dinglers presented a valid military power of attorney, we still find the chancellor's refusal to admit this document was not reversible error, based on his finding the lease / purchase agreement had never, in fact, been terminated.

¶42. "Where error involves the admission or exclusion of evidence, this Court will not reverse unless the error adversely affects a substantial right of a party." *Whitten*, 799 So. 2d at 13 (¶27). The Dinglers claim they detrimentally relied on James's assertion that he, as Kevin's power of attorney, was terminating the agreement. But the chancellor found the evidence proved otherwise. Based on the evidence presented at the final hearing, the chancellor concluded—*regardless* of whether James had a power of attorney—Kevin and the Dinglers never in fact terminated the lease.

¶43. The chancellor based this notion on both Kevin's and the Dinglers' actions after May 10, 2010. Kevin's father and son continued to live on the property. And Kevin's

---

[9] Neither Kevin nor James appeared at the final hearing to verify this was a document executed by Kevin to give James a general power of attorney. The document itself states, "This is a military power of attorney prepared and executed pursuant to Title 10, United States Code, Section 1044b, by a person authorized to receive legal assistance from the military services." But beyond this statement, the Dinglers offered no proof to corroborate that Kevin was in fact "a person authorized to receive legal assistance from the military services." Section 1044 does permit the military to provide legal assistance for civilian affairs to "[c]ivilian employees of the Federal Government serving in locations where legal assistance from non-military legal assistance providers is not reasonably available." 10 U.S.C. § 1044(7) (2012). But according to Pattie, Kevin was not an employee of the federal government. Rather, he was an independent contractor for a *private company* that had a contract with the Department of Defense.

father—who claimed to have Kevin's power of attorney—intended to run the store instead of Pattie. The Dinglers admitted they had no intention to repossess the property or start running the store again. Instead, they were going to let other members of Kevin's family continue to operate Pattie's One Stop.

¶44. We will not disturb a chancellor's finding of fact "unless manifestly wrong or clearly erroneous." *Consol. Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (¶13) (Miss. 1999). And after reviewing the record, we find no clear error.

¶45. Because the lease was never terminated but paid off in the ensuing three years, we affirm the judgment ordering the Dinglers to convey the store to Kevin, who in turn was ordered to convey the store to Pattie as part of the equitable distribution of the marital property.

¶46. **THE JUDGMENT OF THE TISHOMINGO COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, JAMES AND WILSON, JJ., CONCUR.**